EXHIBIT C

Page 1

1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   Index No.:  14-cv-4702(LDW)(ARL)
    ----------------------------------------x
4

    RAMON MORALES,
5

                                Plaintiff,
6

                -against-
7

8   5 BROTHERS RESTAURANT, INC., DENNIS
    D'ONOFRIO, and OLD TOWN INC.,
9

10                              Defendants.
11  ----------------------------------------x
12
13          32 Broadway, Suite 601
            New York, New York 10004
14
15          July 8, 2015
            10:05 a.m.
16
17          EXAMINATION BEFORE TRIAL OF
18  DENNIS D'ONOFRIO, one of the Defendants
19  herein, taken by the Plaintiff, held at the
20  above-mentioned time and place before
21  ANNMARIE OAKLEY, a Notary Public of the
22  State of New York.
23
24
25

1
2      A P P E A R A N C E S
3
 JOSEPH & KIRSCHENBAUM, LLP
4  Attorneys for Plaintiff
        32 Broadway
5      Suite 601
       New York, New York 10004
6
 BY:    LAURA REZNICK, ESQ.
7       D MAIMON KIRSCHENBAUM
8
9  WICKHAM, BRESSLER & GEASA, PC
  Attorneys for Defendants
10     13015 Main Road
       PO Box 1424
11     Mattituck, New York 11952
12 BY:    ERIC J. BRESSLER, ESQ.
13
14       *      *      *
15
16
17
18
19
20
21
22
23
24
25

1
2
3      S T I P U L A T I O N S
4
5      IT IS HEREBY stipulated and agreed by
6  and among counsel for the respective parties
7  hereto, that the sealing and certification
8  of the within deposition shall be and the
9  same hereby waived.
10     IT IS FURTHER STIPULATED AND AGREED
11 that all objections, except to the form of
12 the question, shall be reserved to the time
13 of trial;
14     IT IS FURTHER STIPULATED AND AGREED
15 that the within deposition may be signed
16 before any Notary Public with the same force
17 and effect as if signed and sworn to before
18 the court.
19
20
21
22
23
24
25

1
2  DENNIS D'ONOFRIO, one of the Defendants
3  herein, having first been duly sworn by a
4  Notary Public of the State of New York, was
5  examined and testified as follows:
6  EXAMINATION BY MS. REZNICK:
7      Q   Would you state your name for the
8  record, please.
9      A   Dennis D'Onofrio.
10     Q   Would you state your address for
11 the record, please.
12     A   4 Miranda Drive, Ridge, New York
13 11961.
14     Q   Do you go by any other names
15 besides Dennis D'Onofrio?
16     A.  No.
17     Q.  Before you gave your address, do
18 you have any other residences besides 4
19 Miranda Drive?
20     A.  No.
21     Q.  What is your occupation?
22     A.  I own pizzerias.
23     Q.  More than one?
24     A.  I own two.
25     Q.  What are those two pizzerias?

1          D. D'ONOFRIO
2      A.  Alfredo's and Old Town Pizzeria.
3      Q.  Are you the sole owner of both
4  restaurants?
5      A.  No.
6      Q.  As you know, my firm represents a
7  former employee at your restaurant, Old Town
8  Pizzeria, in a lawsuit against the
9  restaurant.  Do you understand that?
10     A.  Yes.
11     Q.  You understand that I will be
12 asking you some questions today?
13     A.  Yes.
14     Q.  Have you ever been deposed before?
15     A.  Never.
16     Q.  So let's just go over a few ground
17 rules.  The court reporter sitting to your
18 left is taking down everything that you say
19 today.  Because she's transcribing all of my
20 questions and all of your answer, it's
21 important that you give verbal responses to
22 each question rather than nods or hand
23 gestures.
24         The court reporter swore you in a
25 few moments ago.  Do you understand that you

D. D'ONOFRIO

1
2 have the same obligation to tell the truth
3 as if you were testifying in court?
4    A.  Yes.
5    Q.  Do you understand that it would be
6 a crime not to tell the truth today?
7    A.  Yes.
8    Q.  If you don't understand a question
9 I have asked, please, let me know and I will
10 rephrase it.  If you answer the question I
11 will assume that you understood it.  Do you
12 understand that?
13    A.  Yes.
14    Q.  Please, let me finish asking each
15 question before you answer it, even if you
16 think you know what I'm asking.  If you need
17 a break at any time, please, let me know and
18 we'll try to accommodate you.  We only ask
19 that if a question is pending you answer the
20 question before we take a break.  Do you
21 understand that?
22    A.  Yes.
23    Q.  Are you currently taking any
24 medication that would impair your ability to
25 testify truthfully today?

D. D'ONOFRIO

1
2    A.  No.
3    Q.  Is there any other reason you
4 can't testify truthfully today?
5    A.  No.
6    Q.  Are you currently taking any
7 medication that would impair your memory?
8    A.  No.
9    Q.  Is there any other reason your
10 memory might be impaired today?
11    A.  No.
12    Q.  Have you had anything to drink in
13 the last 24 hours?
14    A.  No.
15       MR. BRESSLER:  Objection to form.
16    Q.  Where were you born?
17    A.  In New York.
18    Q.  In New York City or --
19    A.  Queens.
20    Q.  So you can read English, I assume.
21    A.  Yes.
22    Q.  You're proficient in English and
23 understand spoken English?
24    A.  Yes.
25    Q.  What is your educational

D. D'ONOFRIO

1
2 background?
3    A.  I went to college.
4    Q.  Did you graduate?
5    A.  Yes.
6    Q.  Have you had any other jobs
7 besides working at Old Town and Alfredo's?
8    A.  Yes.
9    Q.  What other jobs?
10    A.  I was a Kinesio therapist at Long
11 Island Hospital.
12    Q.  Do you remember when that was?
13    A.  Over 14 years ago.
14    Q.  Have you ever been a party to any
15 other lawsuit prior to this one?
16    A.  No.
17    Q.  Just to clarify, you understand
18 that you're testifying today on behalf of
19 both yourself and Old Town; correct?
20    A.  Yes.
21       (Three page document was marked as
22       Plaintiff's Exhibit 1 for
23       identification.)
24    Q.  I'm handing to you now what has
25 been marked as Plaintiff's Exhibit 1.

D. D'ONOFRIO

1
2    A.  Yes.
3    Q.  Do you recognize this document?
4    A.  It seems similar to ones I looked
5 at in the past.
6    Q.  Similar to ones you looked at in
7 conjunction with this case?
8    A.  Yes.
9    Q.  If you turn to the third page, are
10 you familiar with all of the matters, one
11 through 13, that are listed as subjects for
12 today's deposition?
13    A.  Yes.
14    Q.  Are you the best person to speak
15 to on behalf of the corporation, on behalf
16 of Old Town?  And when I say corporation I'm
17 referring to Old Town Pizzeria Inc.  Did I
18 get the name right?
19    A.  Old Town Pizza Inc.
20    Q.  Are you the best person to speak
21 to on behalf of Old Town Pizza Inc.
22 regarding all of those matters?
23    A.  Yes.
24    Q.  And you're able to answer
25 questions about all of those matters?

D. D'ONOFRIO

1
2     A.  Yes.
3     Q.  What is the basis of your
4  knowledge for those matters?
5         MR. BRESSLER:  Objection to the
6  form of the question.  What exactly would
7  you like him to talk about?  There are 13
8  items listed there.
9     Q.  Let me rephrase.  Why are you
10 familiar with these matters?
11    A.  I don't understand.
12    Q.  Are you familiar with these
13 matters based on your personal experience at
14 the restaurant?
15    A.  To some, yes.
16    Q.  Is there any that you're not
17 personally familiar with?
18    A.  Anything that would be given to my
19 accountant or he filed.
20    Q.  What would those things be?
21    A.  Annual sales volume, I wouldn't
22 know that off the top of my head.  Whatever
23 papers, he would have on that.
24    Q.  With regards to those papers, are
25 you aware that in discovery we requested and

D. D'ONOFRIO

1
2  you're required to turn over any such
3  papers?
4     A.  Yes.
5     Q.  Thus far we have not received any
6  papers regarding the annual sales volume.
7  Will you promptly produce that after the
8  close of the deposition?
9         MR. BRESSLER:  For the record,
10 they have been sent to you.  Apparently they
11 have not arrived.  If they do not arrive
12 within a reasonable time let me know, and we
13 will send you another copy.
14        MS. REZNICK:  Okay.
15    Q.  So other than the annual sales
16 volume, you have personal knowledge of all
17 of the other matters?
18        MR. BRESSLER:  She's referring to
19 the thirteen items; so go through them and
20 answer her question.
21    A.  Yes.
22    Q.  Okay.  Excellent.  Before coming
23 here today, have you reviewed this notice
24 with your attorney?
25    A.  I would say yes.  We read a lot.

D. D'ONOFRIO

1
2     Q.  That brings me to my next
3  question, did you review any other documents
4  in preparation for today's deposition?
5     A.  Only what I submitted to him.
6     Q.  Can you describe what you
7  submitted that you reviewed.
8     A.  Everything that you requested that
9  I had.
10    Q.  Can you be more specific, please.
11    A.  Payroll records, timecard records.
12    Q.  Is it your testimony that
13 everything you reviewed your counsel has
14 already turned over to us?
15    A.  I believe so.
16    Q.  If we have not received any of
17 those documents, you will promptly turn them
18 over?
19    A.  Yes.
20    Q.  Any other documents besides
21 payroll and timecard records that you
22 reviewed in preparation for today?
23    A.  No.
24    Q.  Other than your attorney, have you
25 spoken to any one else about today's

D. D'ONOFRIO

1
2  deposition?
3     A.  No.
4     Q.  Is there anything else that you
5  have reviewed to prepare for today's
6  deposition?
7     A.  No.
8     Q.  Now, let's talk a little bit about
9  the companies.  You mentioned that you own
10 two pizzerias, Alfredo's and Old Town; is
11 that correct?
12    A.  Yes.
13    Q.  Are you the sole owner of both of
14 those?
15        MR. BRESSLER:  Objection to the
16 form.
17    Q.  Are you the sole owner of
18 Alfredo's?
19    A.  No.
20    Q.  Who else owns Alfredo's?
21    A.  My mother.
22    Q.  Can you,please, spell her name.
23    A.  V-e-l-i-a D'Onofrio.
24    Q.  Are you and your mother the only
25 two owners?

4 (Pages 10 - 13)

Page 14

D. D'ONOFRIO

1
2   A.  Yes.
3   Q.  What shares, roughly?
4   A.  50/50.
5   Q.  About Old Town, who else besides
6  you has an ownership in Old Town?
7   A.  My brother Joseph.
8   Q.  Is that also a 50/50 split?
9   A.  Yes.
10   Q.  Do you have any ownership interest
11  in Five Brothers Corporation or any entity
12  with the name Five Brothers?
13   A.  I did.
14   Q.  What interest and what dates
15  approximately was that?
16   A.  I don't recall the dates, but the
17  corporation is closed.
18   Q.  Do you recall when that
19  corporation was closed?
20   A.  I don't recall.
21   Q.  Was it within the last year?
22  Within the last five years?
23   A.  I don't recall.
24   Q.  Is there anything that might jog
25  your recollection?

Page 15

D. D'ONOFRIO

1
2   A.  Maybe if the paper was in front of
3  me.
4   Q.  Without the paper in front of you,
5  you have no idea?
6   A.  I can't honestly answer the
7  question.
8   Q.  Okay.  Fair enough.  So can you
9  tell me what Old Town Incorporated is?
10   A.  A pizzeria.
11   Q.  Where is the pizzeria located?
12   A.  Port Jefferson Station.
13   Q.  What's the address?
14   A.  691 Old Town Road, Jefferson
15  Station.
16   Q.  How long has Old Town been in
17  business?
18   A.  Approximately five years.
19   Q.  Is that how long it's been
20  incorporated as Old Town Inc. or how long it
21  has been there as a pizzeria or both?
22      MR. BRESSLER:  Objection to form.
23   A.  Both.
24   Q.  How long has the restaurant called
25  Old Town Pizza been operating at that

Page 16

D. D'ONOFRIO

1
2  location?
3   A.  About five years.
4   Q.  How long has Old Town Inc, as the
5  corporation, been in existence?
6   A.  About five years.
7   Q.  Is there a written document that
8  contains ownership interest and breakdowns?
9   A.  I would assume that's in the
10  corporate books.
11   Q.  Are you aware that counsel has
12  requested those documents?
13   A.  I'm not aware of that.
14   Q.  Knowing that, would you agree to
15  produce?
16      MR. BRESSLER:  We'll take that
17  under advisement.
18   Q.  Does the corporation have by-laws?
19   A.  I can't honestly answer that.  I
20  don't know.
21   Q.  What is your job title with Old
22  Town Inc.?
23   A.  Just the owner.
24   Q.  Do you have any other title, like,
25  president or COO?

Page 17

D. D'ONOFRIO

1
2   A.  I'm president of the corporation.
3   Q.  As president and owner, what are
4  your duties and responsibilities at Old Town
5  Inc.?
6   A.  Ordering, financial, bookkeeping,
7  and hiring of upper management.
8   Q.  When you say "upper management"
9  what types of positions are you talking
10  about?
11   A.  The managers of the pizzeria.
12   Q.  Do you hire and fire other
13  employees other than managers?
14   A.  No.
15   Q.  But to be clear, as the owner you
16  do have the authority to do so; correct?
17   A.  Absolutely.
18   Q.  If you were to instruct a manager
19  you said -- let me back up.  Who besides
20  yourself has the authority to hire and fire
21  employees?
22   A.  The managers.
23   Q.  How many of those managers are
24  there?
25   A.  Three.

5 (Pages 14 - 17)

D. D'ONOFRIO

1
2    Q.   What are their names?
3    A.   Mario S-a-b-u-z-z-o, A-m-e-d-e-o
4 M-e-l-e-l-l-a, and Ricardo Rodriguez.
5    Q.   How long have each of these
6 managers been with Old Town?
7    A.   Over four years.
8    Q.   All three of them?
9    A.   Yes.
10    Q.   During the last four years, have
11 there been any other people employed as
12 managers?
13    A.   I don't think so.
14    Q.   To the best of your knowledge,
15 approximately, how many employees does Old
16 Town currently have?
17    A.   I'm going to say eight.
18    Q.   You said three managers.  For the
19 other five, what are their job titles?
20    A.   A pizza man, a cook, a prep and a
21 dishwasher, one counter person, I think that
22 would be all.
23    Q.   So is there only one person
24 employed in each position or only one person
25 on duty?

D. D'ONOFRIO

1
2    A.   One person employed in each
3 position.
4    Q.   That person is the only one on
5 duty for each of those positions?
6    A.   Yes.
7    Q.   What is your schedule at the
8 restaurant?
9    A.   I don't have a schedule.
10    Q.   How often are you usually at the
11 restaurant?
12    A.   Once a week.
13    Q.   What hours is the restaurant open?
14    A.   Seven days a week.
15    Q.   What hours?
16    A.   Eleven to ten.
17    Q.   Is it the same hours Monday
18 through Sunday?
19    A.   Yes.
20    Q.   Has that always been?
21    A.   Always.
22    Q.   Besides yourself and the three
23 managers you named, is there anyone else who
24 has authority over employees?
25    A.   No.

D. D'ONOFRIO

1
2    Q.   How about Joseph D'Onofrio?
3    A.   No.
4    Q.   He does not have the power or
5 authority to hire and fire?
6    A.   No.
7    Q.   What are Joseph's
8 responsibilities?
9    A.   He has zero responsibilities at
10 all times.
11    Q.   Are you familiar with how the
12 Plaintiff, Ramon, was hired?
13    A.   I do not.
14    Q.   So you were not the one who hired
15 him?
16    A.   I was not present when he was
17 hired.
18    Q.   Do you know who hired him?
19    A.   I don't recall.
20    Q.   Are you familiar with how his
21 employment ended?
22    A.   I do.
23    Q.   How did his employment end?
24    A.   I believe one of the managers told
25 me that he was not working well with other

D. D'ONOFRIO

1
2 people.
3    Q.   That Mr. Morales was not working
4 well with other people?
5    A.   Yes.
6    Q.   Do you recall which manager this
7 was?
8    A.   I don't recall.
9    Q.   Do you recall when this was?
10    A.   No.
11    Q.   Do you have a ballpark?
12    A.   I would assume that it's the last
13 week that he got a paycheck, which I believe
14 is July.
15    Q.   July of what year?
16    A.   2014.
17    Q.   When the manager came to you and
18 said he wasn't working well with others,
19 what was your response?
20    A.   He came and told me that he was
21 going to replace him.
22    Q.   And did you approve of that
23 decision?
24    A.   I always tell them to feel free to
25 do whatever they have to do.

6 (Pages 18 - 21)

D. D'ONOFRIO

1
2    Q.   To the best of your recollection,
3  how much time passed between your
4  conversation with that manager and when
5  Mr. Morales was terminated?
6    A.   That night.
7    Q.   Were you present when he was
8  fired?
9    A.   No.
10    Q.   Do you know if Mr. Morales was
11  told at the restaurant?
12    A.   I don't know.
13    Q.   Are you familiar with how Mr.
14  Morales was paid when he worked at the
15  restaurant?
16    A.   Yes.
17    Q.   Are you in charge of the payroll?
18    A.   Yes.
19    Q.   So then I would assume that you're
20  familiar with the payroll practices at the
21  restaurant?
22    A.   Yes.
23    Q.   Is there anyone besides you who's
24  better qualified?
25    A.   No.

D. D'ONOFRIO

1
2    Q.   Are you familiar with the
3  employees terms and condition of employment
4  at the restaurant?
5    A.   Yes.
6    Q.   Besides Old Town and Alfredo's, do
7  you own any other businesses?
8    A.   I am owner of other corporations.
9    Q.   What other corporations?
10    A.   884 Middle Country Road Inc.
11    Q.   What's that?
12    A.   A deli.
13    Q.   What's your ownership interest in
14  that?
15    A.   I have 50 percent ownership
16  interest in it.
17    Q.   Is there one other owner or
18  multiple owners?
19    A.   Yes.
20    Q.   Who's the other?
21    A.   Joseph D'Onofrio.
22    Q.   Any other corporations that you
23  have an ownership interest in?
24    A.   Yes.  225 Middle Country Road Inc.
25    Q.   What interest do you have in that?

D. D'ONOFRIO

1
2    A.   Fifty percent.
3    Q.   Who's the other owner in that?
4    A.   David D'Onofrio.
5    Q.   He owns the other 50 percent?
6    A.   Yes.
7    Q.   Any other corporations?
8    A.   That's it.
9    Q.   Do you have any management
10  responsibilities at those other
11  corporations?
12    A.   No.
13    Q.   You said that the restaurant has
14  about eight employees total, how many are
15  usually, how many are usually --
16       MR. BRESSLER:  When you say
17  restaurant, what are you referring to?
18    Q.   When I say the restaurant, unless
19  I say otherwise, I'm referring to Old Town
20  Pizzeria in Port Jefferson.
21       How many employees are on duty
22  at any given shift?
23       MR. BRESSLER:  Objection to the
24  form.
25    Q.   Do you understand the question?

D. D'ONOFRIO

1
2    A.   How many people are on duty --
3    Q.   At one time.
4    A.   It would depends on the day.
5    Q.   What does it depend on?  The day
6  of the week?
7    A.   Yeah.
8    Q.   So on Mondays, how many people on
9  duty?
10       MR. BRESSLER:  I object to the
11  form.  Again, if you can answer it.
12    Q.   Would you like me to rephrase?
13    A.   No.  There would be three.
14    Q.   Who would those three be?
15    A.   A pizza man, a manager, and one
16  other floating position.
17    Q.   Floating position?
18    A.   A dishwasher or the prep guy or a
19  counter.  Sometimes they will go without.
20    Q.   Go without any of those positions?
21    A.   Yes.
22    Q.   Can you describe a little bit
23  about the responsibilities of each of those
24  positions?
25    A.   Pizza man makes the pizza.  The

7 (Pages 22 - 25)

D. D'ONOFRIO

1
2 dishwasher washes the dishes.
3     Q.  What does the prep person do?
4     A.  Prep.
5     Q.  Can you give a little more detail.
6 What do they prep?
7     A.  Sauce, cheese, dough.
8     Q.  So the pizza man and the prep,
9 what are their respective duties in
10 preparing the pizza?
11     A.  He would make the pizza, the pizza
12 man; and the prep guy would make the sauce
13 and the dough and cheese.
14     Q.  So by making pizza you mean
15 putting those ingredients together and
16 spreading the sauce on?
17     A.  Yes.
18     Q.  Who serves the pizza to the
19 customer?
20     A.  The manager.
21     Q.  On some days you said that there
22 was a floating position.  Does that mean
23 that you didn't always have a prep person on
24 duty?
25     A.  Yes.

D. D'ONOFRIO

1
2     Q.  Who would do those duties when the
3 prep person wasn't on duty?
4     A.  They wouldn't.
5     Q.  So the sauce wouldn't get made?
6     A.  It's not something that would have
7 to be done during the entire day it would be
8 done the day before.
9     Q.  You said there would usually be
10 three people on duty on Mondays, was that
11 the case Monday through Thursday?
12     A.  Monday through Thursday, Friday
13 more.
14     Q.  How many people?
15     A.  Five.
16     Q.  What were those positions on duty?
17     A.  You have a cook, pizza man,
18 manager, dishwasher.
19     Q.  That's five.  Just to clarify, you
20 said the pizza man would put the ingredients
21 together.  What did the cook do?  Would the
22 cook be the one to put it in the oven?
23     A.  No.  If he had to cook something
24 in the kitchen, like, a hero.
25     Q.  I don't believe you mentioned the

D. D'ONOFRIO

1
2 cook as one of the people on duty Monday
3 through Thursday.  Did you not serve things
4 like heros?
5     A.  No.  That's when the manager --
6 it's not very busy on a Monday.
7     Q.  But the whole menu was available
8 all the time?
9     A.  Most of the time.
10     Q.  Who sets the employee's schedules?
11     A.  The managers.
12     Q.  So Ricardo Rodriguez, Mario, and
13 Amedeo?
14     A.  Yes.
15     Q.  Were they the only ones involved
16 in setting the schedules?
17     A.  Yes.
18     Q.  Was it their decision which
19 positions were on duty each day or was that
20 yours?
21     A.  Yes, their position.
22     Q.  Did you have involvement in
23 deciding which positions were needed each
24 day?
25     A.  No.

D. D'ONOFRIO

1
2     Q.  You had no involvement with
3 setting the schedules?
4     A.  No.
5     MR. BRESSLER:  Yes, no he didn't.
6     MS. REZNICK:  Thank you for
7 clarifying.
8     Q.  That was my understanding that
9 what you meant was, no you did not have
10 involvement with setting schedules.
11     A.  Yes.
12     Q.  How were employees informed what
13 their schedule would be each week?  Was
14 there a written schedule?  Would the
15 managers call them?
16     A.  The managers would tell them.
17     Q.  Would the schedule of who was on
18 duty vary every week?
19     A.  A few hours here and there.
20     Q.  It would vary by a few hours here
21 and there, but were employees generally on
22 duty the same amount of hours?
23     A.  Yes.
24     Q.  With the possible variation of a
25 few hours, were they generally on duty the

8 (Pages 26 - 29)

D. D'ONOFRIO

1
2 same hours each day most of the time?
3     A.  With a variation of hours.
4     Q.  Can you give an example.
5     A.  Instead of coming in at 11 on
6 Friday, they would probably come in at three
7 on the Monday.
8     Q.  What would determine it?
9     A.  The course of business.
10    Q.  Were employees called in, in
11 advance or was it set in advance?
12    A.  No.  Set in advance.
13    Q.  When you say "course of business"?
14    A.  We knew that we would be busier of
15 certain days and slower on certain days.
16    Q.  Did that vary from week to week,
17 like, you knew one week you would be busier
18 on the Monday and the next week busier on
19 the Thursday?
20    A.  Generally the same.
21    Q.  So then why would employee's hours
22 sometimes vary from week to week each day?
23    A.  If it slows down earlier.  If they
24 came in on their own.  If the weather was
25 bad and business was slower they would go

D. D'ONOFRIO

1
2 home earlier.  If they came in later on
3 their own.
4     Q.  Who would decide to send them home
5 if it was slow?
6     A.  The managers.
7     Q.  When you say "They came in late on
8 their own." was that with permission?  Was
9 the schedule set that way or they just
10 showed up late?
11    A.  Sometimes they just showed up
12 late.
13    Q.  Was there any policy on arriving
14 on time?
15    A.  No.
16    Q.  Just to clarify, to the best of
17 your recollection were there any written
18 schedules?
19    A.  Yes.
20    Q.  Were they distributed to employees
21 or posted on a bulletin board?
22    A.  Posted.
23    Q.  Are you aware if these schedules
24 still exist?  Are there any records of any
25 schedules?

D. D'ONOFRIO

1
2     A.  No.
3     Q.  Why not?  Are they not retained
4 from week to week?
5     A.  No.
6     MR. BRESSLER:  Yes, they are not.
7 Is that your answer?
8     THE WITNESS:  Yes.
9     MR. BRESSLER:  Is it that they're
10 not retained week to week?
11    THE WITNESS:  Yes.  They are not
12 retained.
13    Q.  Prior to today's deposition, upon
14 receiving Plaintiff's counsels discovery
15 request, did you or anyone else at Old Town
16 take any steps to check whether any
17 schedules existed?
18    A.  I don't understand.
19    Q.  Did you search your records to
20 make sure that you didn't have a single
21 schedule?  Did you attempt to find any?
22    A.  We don't save them.
23    Q.  Are they made on the computer?
24    A.  No, on a piece of paper written
25 out.

D. D'ONOFRIO

1
2     Q.  To the best of your recollection,
3 when did Mr. Morales begin working at Old
4 Town, if you recall?
5     A.  I don't recall.
6     Q.  To your knowledge, are there any
7 records regarding Mr. Morales's termination?
8 Was he given a written termination letter?
9     A.  No.
10    Q.  The conversation you had about
11 terminating him, that was an oral
12 conversation?
13    A.  Yes.
14    Q.  There are no other records
15 regarding that decision?
16    A.  No ma'am.
17    Q.  To best of your knowledge, what
18 were Mr. Morales's job duties?
19    A.  He started as a dishwasher.
20    Q.  How long did he work as a
21 dishwasher?
22    A.  I don't recall.
23    Q.  What other position, if any, did
24 he have?
25    A.  He went to prep.

9 (Pages 30 - 33)

Page 34

D. D'ONOFRIO

1
2    Q.   To the best of your knowledge --
3    it's okay if you give a ballpark.  Do you
4    have any knowledge of when that changed?
5    How long he worked in each position?
6    A.   I don't recall.
7    Q.   During the time that Mr. Morales
8    was employed in each position, was he the
9    only one employed in each position, or were
10   there others that had the same job?
11   A.   Only one.
12   Q.   Let's start with when he was a
13   dishwasher.  Was he the only dishwasher
14   employed by Old Town?
15   A.   Yes.
16   Q.   If he was not on duty, how did the
17   dishes get washed?
18   A.   They would wait for him to get
19   there.
20   Q.   How often did you have a
21   dishwasher in the restaurant?
22   A.   Half of the day.
23   Q.   What about for the prep position?
24   A.   Half the day.
25   Q.   Was it in the beginning or the

Page 35

D. D'ONOFRIO

1
2    end?
3    A.   Prep mid-morning to afternoon,
4    dishwasher generally late afternoon to
5    evening.
6    Q.   You say late afternoon to evening,
7    how late in the evening generally?
8    A.   8:30, 9 o'clock-ish.
9    Q.   For the prep, generally, how late
10   would a prep be there?
11   A.   11 to 4-ish, 11 to 5.
12   Q.   For either position, either
13   dishwasher or prep, were there any duties
14   that had to be performed before the
15   restaurant opened in morning or after it
16   closed?
17   A.   No.
18   Q.   So to the best of your
19   knowledge -- we touched on this but I just
20   want to clarify.  When Mr. Morales worked as
21   a dishwasher you said he would generally
22   start in the late afternoon?
23   A.   Yes.
24   Q.   Can you give a ballpark of what
25   time?

Page 36

D. D'ONOFRIO

1
2    A.   I would only by speculating.
3    MR. BRESSLER:  Don't guess.
4    Q.   Do you have any records of what
5    hours that Mr. Morales was scheduled for
6    each week?
7    A.   No.
8    Q.   Does Old Town have a system for
9    tracking the hours that employees work?
10   A.   Yes.
11   Q.   Can you describe that system?
12   A.   It's a timecard system now.
13   Q.   When you say "timecard system," is
14   that a machine?
15   A.   Yes, now it is.
16   Q.   Approximately, when was that
17   implemented?
18   A.   About two years ago.
19   Q.   Prior to the timecard machine, how
20   were employee's hours tracked?
21   A.   On the computer.
22   Q.   When you say on the computer,
23   that's a POS, or a point of sale?
24   A.   Yes.
25   Q.   My understanding of a point of

Page 37

D. D'ONOFRIO

1
2    sale system is, it is used primarily to take
3    customer's orders; correct?
4    A.   It does everything.
5    Q.   When you use the POS, were
6    employees instructed to log-in as soon as
7    they started working?
8    A.   Yes.
9    Q.   To the best of your knowledge, did
10   employees always clock in?
11   A.   Yes.
12   Q.   Did Mr. Morales understand that he
13   was supposed to clock in using a POS?
14   A.   Yes.
15   MR. BRESSLER:  Objection to the
16   form.
17   Q.   Did you personally ever discuss
18   with Mr. Morales, instruct him that he was
19   supposed to clock in?
20   A.   Yes.
21   Q.   You did personally?
22   A.   I am the one who would have put
23   him in through the computer.
24   Q.   Did you personally speak with Mr.
25   Morales and inform him that he needed to?

10 (Pages 34 - 37)

D. D'ONOFRIO

1
2    A.  Yes.
3    Q.  When you say you put him into the
4  computer, can you clarify what you said?
5  You were not present everyday in the
6  restaurant; correct?
7    A.  Yes.
8    Q.  Would Mr. Morales clock into the
9  POS himself or would the managers do it for
10  him?
11    A.  He would do it for himself.
12    Q.  How does an employee log-in?
13    A.  Once I enter their information
14  into the POS they go to the time clock
15  button, they hit time clock, it asks them
16  for their code and they put their code and
17  it clocks him in.
18    Q.  This was under the POS system?
19    A.  Yes.
20    Q.  What about under the timecard
21  system that's being used now?
22    A.  It's an external time clock with
23  cards.
24    Q.  Can you describe how it works?
25    A.  You take your employee card out of

D. D'ONOFRIO

1
2  the slot and deposit it into the top.  The
3  machine takes a printout of the date and
4  time they come in and ejects it.  They take
5  it and put it back in the rack.  When they
6  leave they do the same thing.
7    Q.  What about the POS, how did
8  employees clock out?
9    A.  Go back to the POS and clock them
10  out.
11    Q.  To the best of your knowledge, was
12  there ever a time in the last four years
13  when the system you had in place was not
14  functioning?
15    A.  No.
16    Q.  What steps did you or Old Town
17  take to make sure that employees were
18  accurately recording all of their hours?
19    A.  The employees themselves made sure
20  that they were accurately coming in and
21  clocking in and out in order to get paid.
22    Q.  Let's start with the POS system,
23  you explained how employees use it, they had
24  to clock in and out.  How did you then use
25  those records to do payroll?  Can you

D. D'ONOFRIO

1
2  describe the mechanism?  Can you describe
3  the process you used when doing payroll
4  based on the hours an employees worked.
5    A.  The computer would print out that
6  payroll receipt and that's what they would
7  get paid.
8      (One page document was marked as
9      Plaintiff's Exhibit 2 for
10      identification.)
11    Q.  You now have in front of you a
12  document marked Plaintiff's Exhibit 2,
13  Bates stamped number 000126.
14    A.  Yes.
15    Q.  Do you recognize this document?
16    A.  It looks like a time sheet.
17    Q.  When you said the machine printed
18  something out, was this what it would print
19  out?
20    A.  Yes.
21    Q.  And this was from the POS system;
22  correct?
23    A.  Yes.
24    Q.  Which you said was in place until
25  two years ago?

D. D'ONOFRIO

1
2    A.  Yes.
3    Q.  When you got the new time card
4  machine, how did that output records for you
5  to do payroll?
6    A.  The time card goes in the machine
7  and it calculates all the time.  When it
8  gets to 40 hours it goes into an overtime
9  bracket and calculates the overtime.
10    Q.  How does it output the records for
11  you to do payroll?
12    A.  Then we take the hourly wage
13  amount multiplied by the first 40 hours, and
14  their overtime by time and a half.
15    Q.  This was a printout from the old
16  machine; correct?
17    A.  Yes.
18    Q.  I would assume for the new machine
19  the printout wouldn't look the same, because
20  it's a different system; so to your
21  knowledge have you produced records from the
22  new payroll machine at my request?
23    A.  No one's requested those.
24    Q.  We requested all payroll, all time
25  keeping records for the time Mr. Morales was

11 (Pages 38 - 41)

D. D'ONOFRIO

1
2  --
3     A.  You have them from when he was
4  employed.
5     Q.  Which was until, to the best of
6  your recollection, July 2014?
7     A.  Yes.
8        (Four page document was marked as
9        Plaintiff's Exhibit 3 for
10       identification.)
11    Q.  You should have a copy in front of
12  you of what's been marked as Plaintiff's
13  Exhibit 3.
14    A.  Yes, ma'am.
15    Q.  Do you recognize this document?
16    A.  It looks like a time sheet.
17    Q.  What are the dates of the first
18  one, Bates stamped number 214 at the bottom?
19    A.  3/31/2014 to 4/6/2014.
20    Q.  Are these the records from the old
21  time keeping machine or the new one?
22    A.  Old.
23    Q.  Do you have any recollection of
24  when it changed to the new one?  Previously
25  you said about two years ago.

D. D'ONOFRIO

1
2     A.  Yeah.  It looks like I might be
3  wrong on that.  I don't exactly recall the
4  exact date.  I should have answered it that
5  way.
6     Q.  I should have printed them all
7  out, but the latest record that you have,
8  that you produced to us, looked like this
9  and it ended July 17, 2014.  To the best of
10  your knowledge, was that the last day Mr.
11  Morales worked?
12    A.  Yes.
13    Q.  So to the best of your
14  recollection, was the time keeping system
15  changed before or after his employment?
16    A.  After.
17    Q.  So then it was sometime in the
18  last year?
19    A.  Yes.  It would make sense now.
20    Q.  To the best of your recollection,
21  did Mr. Morales ever use a timecard?
22    A.  No.
23    Q.  If you look again at the first
24  page of Plaintiff's Exhibit 3.  I believe
25  you said that these were a printout.  To

D. D'ONOFRIO

1
2  your knowledge, is this an accurate
3  reflection of the hours that Mr. Morales
4  worked each week?
5     A.  I believe so.
6     Q.  So the restaurant was open 11 to
7  10 everyday; correct?
8     A.  Yes, ma'am.
9     Q.  There were never any tasks that
10  employees had to perform after the
11  restaurant closed; correct?
12    A.  No.
13       MR. BRESSLER:  Well, she asked
14  you, is that statement correct.
15       MR. KIRSCHENBAUM:  I think we can
16  just go with the natural flow of your
17  client's answer.  You're not testifying,
18  your client is testifying.
19       MR. BRESSLER:  I want to clarify
20  if for the record.
21       MR. KIRSCHENBAUM:  You could
22  correct the testimony on the errata sheet.
23       MR. BRESSLER:  Let's not waste
24  time.  Counsel and I have seen that there
25  have been instances that have given rise to

D. D'ONOFRIO

1
2  a yes or no that does no accurately reflect
3  what it is you're asking, and I want to make
4  sure --
5       MS. REZNICK:  I'm not sure I agree
6  with the characterization.  I was being
7  polite in all of those instances.  I
8  understand what he was saying.
9        (A short break was taken.)
10    Q.  The time clock system in general,
11  you said these were all generated from the
12  POS system; correct?
13    A.  Yes.
14    Q.  You said employees would use a
15  code and log into the POS when they started
16  working each shift: right?
17    A.  Yes.
18    Q.  And unless they were taking
19  customer orders they could forget to clock
20  in?
21    A.  They could.
22    Q.  If somebody forgot to clock in and
23  the manager realizes it, could a manager go
24  back and clock in for the employee so that
25  the employee didn't lose time?

D. D'ONOFRIO

1
2    A.  Yes.
3    Q.  So the managers all had access to
4 the system then.
5    A.  Everybody.
6    Q.  Everybody meaning what?
7    A.  Every employee had access to the
8 system.
9    Q.  And the three managers had access
10 to the records of other employees so that
11 they could clock them in, if they forgot?
12   A.  They could adjust their timecard.
13   Q.  You said "timecard"?
14   A.  The time sheet.
15   Q.  How would they adjust the time
16 sheet?
17   A.  They would go in and clock him in
18 and do a manager override.
19   Q.  Who have the authority to do that?
20   A.  The manager on duty.
21   Q.  The three people we discussed
22 before?
23   A.  Yes.
24   Q.  To save time going forward, I want
25 to clarify when we say the "three managers"

D. D'ONOFRIO

1
2 we're talking about Mario, Ricardo, and
3 Amedeo?
4    A.  Yes.
5    Q.  Those three people could override
6 an employees time and alter the record, if
7 needed; correct?
8    A.  They can't.  I wouldn't say they
9 could alter the records, they could correct
10 it.
11   Q.  By "correct," what do you mean?
12   A.  Make sure they get their time
13 worked.
14   Q.  Was there a time limit on how
15 long, after the fact, the manager override
16 would work?
17   A.  That day.
18   Q.  So a manager couldn't go and
19 override if they realize the employee forgot
20 to clock in the previous day?
21   A.  No.
22   Q.  What would happen?
23   A.  They would just write it out.
24   Q.  They would write you a note?
25   A.  Yeah.

D. D'ONOFRIO

1
2    Q.  Could you also correct timecards
3 if needed or correct time records if needed?
4    A.  I could, if I was there.
5    Q.  Do you recall ever having an
6 occasion of doing that?
7    A.  No.
8    Q.  To the best of your knowledge, how
9 often did the manager use an override?
10   A.  I can't answer that.  I was not
11 there.
12   Q.  Using these records, what system
13 did you use to pay employees?  Did you
14 employee a payroll company?
15   A.  No.
16   Q.  How did you pay employees?  Were
17 they paid by cash or check?
18   A.  Through cash and check.
19   Q.  Was it cash some weeks and checks
20 the other weeks or a combination of each?
21   A.  It was a combination.
22   Q.  What percentage would you say was
23 paid in each format?
24   A.  I can't recall what the percentage
25 was.

D. D'ONOFRIO

1
2    Q.  Do you recall how much Mr. Morales
3 was paid?
4        MR. BRESSLER:  Objection to the
5 form.
6    Q.  To the best of your knowledge, how
7 much was Mr. Morales paid?
8        MR. BRESSLER:  Per week?
9        MS. REZNICK:  Per week.
10   A.  I believe that he was paid by what
11 was on the time sheet.
12   Q.  So is it your testimony that he
13 was paid an hourly rate?
14   A.  Yes.
15   Q.  And do you have any records of
16 having paid him, any records of the checks
17 and or the cash that he was paid?
18   A.  I have copies.  I'm trying to find
19 copies of checks which would reflect his
20 W-2.
21   Q.  Did the W-2 reflect all payments
22 or just the part paid by check?
23   A.  Just the part paid by check.
24   Q.  Do you have records of any amounts
25 that were paid in cash?

13 (Pages 46 - 49)

D. D'ONOFRIO

2  A.  No.

3  Q.  So theoretically based, it's your
4 testimony that you can't find records of
5 checks and you have no record of the cash;
6 correct?

7  A.  The checks I'm sure we will find,
8 and it will be indicated by the W-2s.

9  Q.  Have you produced the W-2s?

10  A.  Yes.

11  Q.  Do you recall when you --

12  MR. BRESSLER:  They're on their
13 way.  They're in the same package.

14  MR. KIRSCHENBAUM:  I'm sorry are
15 you testifying?

16  MR. BRESSLER:  The question was:
17 Were they produced?  I told counsel a
18 package was mailed to her, and I'm
19 representing that they were in there.  If
20 you don't receive them in a timely manner,
21 let me know.

22  MR. KIRSCHENBAUM:  I'm just going
23 to note for the record, it is not within
24 your right to testify at your client's
25 deposition.

D. D'ONOFRIO

2  MR. BRESSLER:  It is within my
3 right to inform counsel as to whether they
4 have been provided to her.

5  MR. KIRSCHENBAUM:  Let your client
6 answer the pending question.

7  MS. REZNICK:  Would you like to be
8 sworn in as well?

9  MR. BRESSLER:  No.  I'm telling
10 you that, that is what the status is.  If
11 you don't get them let me know and we will
12 provide them again.

13  MS. REZNICK:  I will make my own
14 statement for the record that, as of July
15 8th, the only thing we received is this.  We
16 have not received any records of any
17 payments.

18  So based on what we have received,
19 theoretically, if Mr. Morales were to
20 testify that you never paid him a penny, do
21 you have any record that would contradict
22 that?

23  MR. BRESSLER:  Objection to the
24 form.  It calls for speculation.

25  THE WITNESS:  Speaking of

D. D'ONOFRIO

2 theories, the same theory that you're
3 implying, would it be -- how should I say
4 this?  If we're talking in theories, such
5 as, you just implied that a man has not
6 gotten paid, would somebody come back to
7 work if they did not get paid?  And how
8 would they live?

9  Q.  It's a hypothetical question.  The
10 question was about records you have to
11 verify that he was paid.  If he were to
12 testify that he was paid a flat amount per
13 week, do you have any records that would
14 contradict that?

15  A.  No.

16  Q.  If he were to testify that he
17 never received any payments in cash and that
18 his W-2 reflected his whole earnings, you
19 have no records.  To be clear, I'm not
20 representing that is his testimony, but you
21 would have no records to show that you paid
22 him anything besides what's in his W-2;
23 correct?

24  A.  Other than his testimony that he
25 received that money every week.

D. D'ONOFRIO

2  Q.  If he did, in fact, receive it but
3 you have no --

4  A.  It's my understanding in the
5 complaint that he said he received "X"
6 amount of dollars per week; so he's already
7 admitted to accepting that.

8  Q.  I understand.  I'm just asking
9 what records you have.  Do you believe that
10 his complaint accurately reflects the amount
11 that he was paid?

12  A.  I believe that it accurately
13 represents what he worked and got paid for.

14  Q.  Turn to Plaintiff's Exhibit 2,
15 Bates stamped number 126.  One more question
16 about this.  Do you see below where it says
17 "wage advance less" can you explain what
18 that is?

19  A.  That would be what he got paid
20 that week.

21  Q.  Why is it referred to as a wage
22 advance?  Is it your testimony that he was
23 paid before he worked?

24  A.  I don't know.

25  Q.  If you turn to the line below "net

14 (Pages 50 - 53)

D. D'ONOFRIO

1
2 payable before taxes," it shows a negative
3 amount.
4    A.   I have no idea why that is.
5    Q.   Is there anybody who be able to
6 explain what those columns mean?
7    A.   I'm going to answer no, as to,
8 there's nobody else that can explain it.
9    Q.   You said you didn't use a payroll
10 company.  Did you handwrite checks?
11    A.   Yes.
12    Q.   You did this for all employees,
13 every week?
14    A.   Yes.
15    Q.   Do you recall what day of the
16 week?
17    A.   Sundays.
18    Q.   Did the check say Old Town on it?
19 Did it have your personal name?
20    A.   It said Old Town.
21    Q.   As of now you have been unable to
22 locate any records of those checks; correct?
23    A.   Yes.
24       (One page document was marked as
25       Plaintiff's Exhibit 4.)

D. D'ONOFRIO

1
2    Q.   Do you recognize the document
3 marked Plaintiff's Exhibit 4, Bates stamped
4 number 000109?
5    A.   Yes.
6    Q.   Do you recognize that document?
7    A.   Yes.
8    Q.   What is it?
9    A.   The form we have employees fill
10 out when they are hired.
11    Q.   Do you recall giving this document
12 to Mr. Morales?
13    A.   Yes.
14    Q.   To the best of your recollection,
15 did you give it to him when he started
16 working?
17    A.   Yes.
18    Q.   You did.  So now seeing this, you
19 said you didn't know.  Are you sure now that
20 it was April of 2012?
21    A.   Right around that time give or
22 take a week or two.
23    Q.   Just to go back to what we talked
24 about previously.  You said that you would
25 pay people some amount in cash and part in a

D. D'ONOFRIO

1
2 check, was that the case the entire time
3 that Mr. Morales worked there or was there
4 ever a time that he was paid only cash?
5    A.   There was a time that he was paid
6 only cash.
7    Q.   Do you know what time?
8    A.   I believe 2012.
9    Q.   Do you recall when you switched to
10 paying him only by checks?
11    A.   When he asked me to.
12    Q.   Do you recall when that was?
13    A.   No.
14    Q.   Do you recall what your response
15 was?
16    A.   Absolutely.
17    Q.   Is it possible that Mr. Morales
18 got this wage notice when he asked to be
19 switched?
20    A.   No.
21    Q.   You're sure that this was given to
22 him as soon as he started?
23    A.   That's why it's dated with his
24 signature.
25    Q.   So just to be clear, even though

D. D'ONOFRIO

1
2 you were paying all cash it was your
3 practice to give the wage notice?
4    A.   Yes.
5    Q.   Were all employees paid in cash at
6 that time, before Mr. Morales asked to be
7 paid by cash?
8    A.   I don't recall.
9    Q.   Did you discuss this document with
10 Mr. Morales and make sure that he understood
11 it?
12    A.   Yes.
13    Q.   To the best of your recollection,
14 was Mr. Morales ever given a copy of the
15 notice?
16    A.   Yes.
17       (One page document was marked as
18       Plaintiff's Exhibit 5.)
19    Q.   Do you recognize that document?
20    A.   Yes.
21    Q.   What is it?
22    A.   The pay rate.
23    Q.   You mean it states the pay rate?
24    A.   Yes.
25    Q.   But what is the document itself?

15 (Pages 54 - 57)

Page 58

D. D'ONOFRIO

1
2    A.  I don't understand the question.
3    Q.  When do you recall seeing this
4 document before?
5    A.  When it was filled out.
6    Q.  On or around March 15, 2013?
7    A.  Yes.
8    Q.  This was given before a change in
9 pay rate?
10    A.  Yes.  It looks that way.
11    Q.  Do you recall, was Mr. Morales
12 given a raise at that time?
13    A.  I believe so.
14    Q.  Do you recall why he was given a
15 notice at that particular time?
16    A.  I would assume he got a pay raise.
17    Q.  It says here "weekly hours 37" did
18 he always work 37 hours a week?
19    A.  On or about.
20    Q.  How did you come up with the
21 number 37?  Did you look at previous payroll
22 records to determine that or how did you
23 come up with the 37 in particular?
24    A.  That would be six day a week,
25 roughly six hours a day.

Page 59

D. D'ONOFRIO

1
2    Q.  Your understanding was that he was
3 scheduled for six hours a day, six days a
4 week?
5    A.  Yes.
6    Q.  Where does the one extra hour come
7 from?
8    A.  Give or take.
9    Q.  So 37 was your best estimate based
10 on that?
11    A.  Yes.
12    Q.  It says here, "My primary language
13 is Spanish." but he was given the notice in
14 English only because the Department of Labor
15 does not offer a pay notice -- was it your
16 understanding, at that time, that the
17 Department of Labor had no notices in
18 Spanish?
19    A.  That's what it states there.
20    Q.  But in 2012 you provided it in
21 Spanish?
22    A.  Right.
23    Q.  Do you recall checking to see if
24 there was a Spanish form in 2013?
25    A.  No.

Page 60

D. D'ONOFRIO

1
2    Q.  So you checked this box that there
3 was no notice available in Spanish, but in
4 reality did you not attempt to check if
5 there was a notice in Spanish?
6    A.  I didn't know it was my duty to
7 check that.
8    Q.  Would you agree with the statement
9 that Mr. Morales does not speak or read
10 English proficiently?
11    A.  That is a lie.
12    Q.  You believe that he is fluent in
13 English?
14        MR. BRESSLER:  Just say yes or no.
15    A.  I believe he can communicate in
16 English.
17    Q.  To the best or your knowledge, is
18 he proficient with written English?
19    A.  Yes.
20    Q.  Is that based on you personally
21 observing him?
22    A.  I have no reason not to believe
23 it.
24    Q.  But you have no knowledge that he
25 is able to read English and, in fact, it

Page 61

D. D'ONOFRIO

1
2 says that his primary language is Spanish?
3    A.  His primary language is Spanish,
4 yes.
5    Q.  To the best of your recollection,
6 was Mr. Morales ever given any other notices
7 like this?
8    A.  No.
9        MR. BRESSLER:  Objection to the
10 form.
11    Q.  Was Mr. Morales ever given a
12 notice on or before February 1st of 2013?
13    A.  If I had something and it's not
14 here, then I have misplaced it.
15    Q.  But you don't have any specific
16 recollection of giving this wage notice at
17 any time besides these two; correct?
18    A.  I can not recall that.
19    Q.  Do you recall ever giving him a
20 notice like this in 2014?
21    A.  To say that I did remember or
22 didn't remember would be just speculating.
23    Q.  So you have no specific
24 recollection?
25    A.  No specific recollection.

16 (Pages 58 - 61)

D. D'ONOFRIO

1
2    Q.   Do you recall if it was Old Town's
3  practice, generally, to give these to
4  employees?
5    A.   Yes.
6    Q.   Every year?
7    A.   Yes.
8    Q.   To give it to every employee at
9  what times?
10    A.   When we got to it.
11    Q.   When you got to it?
12    A.   At times it would slip our mind.
13  When they were hired they were filled out,
14  but it my understanding that it had to
15  filled out yearly and sometimes it was a
16  little more or a little less than a year.
17    Q.   So your employees didn't always
18  receive them annually on or before February
19  1st then?
20    A.   I can't say all employees.
21    Q.   So just to clarify, you said you
22  and Old Town were not previously aware of
23  any duties to provide these forms in a
24  language that the employee understood?
25    A.   Yeah.

D. D'ONOFRIO

1
2    Q.   Do you or Old Town know what the
3  minimum wage is?
4    A.   I do.
5    Q.   Do you or Old Town understand what
6  overtime is?
7    A.   Yes.
8    Q.   What is your understanding of it?
9    A.   One and a half times the minimum
10  wage.
11    Q.   What is it your understanding of
12  when overtime is required?
13    A.   Over 40 hours.
14    Q.   In what time period?  Over 40
15  hours a month?  A week?
16    A.   A week.
17    Q.   To your knowledge, did Old Time
18  pay all employees at least the minimum wage
19  for all hours worked?
20    A.   Yes.
21    Q.   Is it your testimony that Old Town
22  always paid employees for overtime worked
23  over 40 hours a week?
24    A.   Yes.
25    Q.   From the start of Mr. Morales's

D. D'ONOFRIO

1
2  employment until today, do you recall if
3  there was ever a time that he was paid less
4  than $7.25 an hour?
5    A.   No.
6    Q.   From January 1, 2014, until today,
7  was there ever a time when Mr. Morales was
8  paid less than $8 per hour?
9    A.   No.
10    Q.   What if anything have you done to
11  ensure that your compensation practices are
12  in accordance with State and Federal law?
13    A.   What do you mean by that?
14    Q.   Did you ever consult with a lawyer
15  or go to any seminar?  What steps did you
16  take when you opened Old Town, or any time
17  since, to make sure that you were following
18  all the rules with regards to paying
19  employees?
20    A.   I educated myself on it.  I guess
21  by asking my accountant questions, as to
22  minimum wage and overtime.
23    Q.   Is this the same accountant that
24  you said would have the knowledge of your
25  sales volume?

D. D'ONOFRIO

1
2    A.   Yes.
3    Q.   Can you, please, state the
4  accountant's name for the record.
5    A.   Joseph S-e-r-r-a.
6    Q.   Can you, please, provide if you
7  know it off the top of your head, if not
8  after the deposition we would request that
9  you provide contact information for Mr.
10  Serra and for the three individuals you
11  named as managers.
12        MR. BRESSLER:  Just leave a space
13  in the record.
14  INSERT_____
15  INSERT_____
16  INSERT_____
17  INSERT_____
18    Q.   You said you educated yourself
19  through speaking to your accountant, do you
20  have any documents that you read or any
21  other documents that show, like, the steps
22  you took to make sure you were complying
23  with the law?
24    A.   I would have no written --
25    Q.   What if anything have you or Old

17 (Pages 62 - 65)

D. D'ONOFRIO

1
2 Town done to ensure that the restaurant
3 complies with State and Federal law?
4     A.  We try our best.
5     Q.  But no specific steps that you can
6 point to regarding the record keeping and
7 notice provision?
8     A.  Notices are these, I would assume,
9 that are given to employees at the time of
10 hire.
11    Q.  Are you the one that gives them?
12    A.  Yes.
13    Q.  What about with regards to
14 recordkeeping, do you keep -- are there any
15 steps that are taken to ensure that you
16 retain all the records that you're required
17 to retain under State and Federal Law?
18    A.  We try.
19        (A break was taken.)
20 CROSS-EXAMINATION BY MR. BRESSLER:
21    Q.  Mr. D'Onofrio, you were asked a
22 series of questions earlier about the
23 numbers that were contained in the complaint
24 reflecting the $400 a week and later $450 a
25 week.  Do you remember those questions that

D. D'ONOFRIO

1
2 counsel put to you?
3     A.  Yes.
4     Q.  Do you remember being asked
5 whether you thought they reflected
6 accurately what he actually was entitled to?
7     A.  Yes.
8     Q.  Was the actual amount that he
9 earned each week uniform at $400 or did this
10 vary?
11    A.  It varied.
12    Q.  So would it be fair to say that,
13 the number in the complaint overall roughly
14 approximates, while at the same time
15 varying, the amount week to week he would
16 have earned?
17    A.  Yes.
18    Q.  You were asked questions earlier
19 about the notation that relates to wage
20 advances.
21    A.  Yes.
22    Q.  I would like to ask you whether
23 you could take a look at that again and tell
24 me whether you know what a wage advance
25 entry refers to?

D. D'ONOFRIO

1
2     A.  That would be money that he had
3 taken throughout the week.
4     Q.  You mean prior to the normal
5 payday?
6     A.  Yes.
7     Q.  Would that have happened during
8 the weeks that such an advance is reflected
9 on the time sheets that you were shown?
10    A.  Can you state that again?
11    Q.  Would that have occurred during
12 the weeks where it's indicated on the
13 exhibits, that you were shown, the time
14 sheets, are those weeks that it would have
15 happened?
16    A.  Yes.
17    Q.  Did the amount vary from week to
18 week?
19    A.  Yes.
20    Q.  And some weeks there were none, no
21 wage advances; is that right?
22    A.  Yes.
23        MS. REZNICK:  Objection to the
24 form.  Leading.
25        MR. BRESSLER:  It's

D. D'ONOFRIO

1
2 cross-examination.
3        MS. REZNICK:  Note my objection to
4 the form.
5     Q.  Were the wage advances taken into
6 account at the end of the week when
7 determining the total amount that was due?
8     A.  Yes.
9 RE-DIRECT BY MS. REZNICK:
10    Q.  Just to be clear, ten minutes ago
11 you did not know what these wage advances
12 were, what have you done in the time since
13 to refresh you recollection?
14    A.  Since we don't use those sheets
15 any more I was looking over them and the
16 first sheet that you provided showed a wage
17 advance at $400 and the negative $141.90,
18 and I didn't know how those numbers
19 correlated to his paycheck, being it was a
20 total payout of $400 which was about what he
21 got total a week.
22        When you look back on Exhibit 3,
23 the first page shows a wage advance and his
24 net payable before taxes, and that jogged my
25 memory that the advances were money that was

18 (Pages 66 - 69)

D. D'ONOFRIO

1
2 taken against his check before paychecks
3 were paid.
4        To answer your question about the
5 $141.90 which was on Exhibit 2, that would
6 be money that he owed the store.
7    Q.  Do you have any records of him
8 having been paid these wage advances
9 throughout the week?
10   A.  Just what's in this computer,
11 these records.
12   Q.  But no records of the actual
13 payment?
14   A.  What do you mean by a record?
15   Q.  Like either a check or a note, a
16 contemporaneous record noting it, a ledger
17 that shows it.  When you went to prepare
18 payroll, how did you keep track by how much
19 money had been advanced?
20   A.  By this sheet.
21   Q.  Did you enter something into the
22 computer?
23   A.  Each time he took a wage advance
24 it would have been entered into the
25 computer; so that is stored information in

D. D'ONOFRIO

1
2 the computer.
3    Q.  How is it stored, is it in the
4 POS?
5    A.  The manager would go to -- wage
6 advance is an option in the POS.  It would
7 select the employee and the employee would
8 get that money, which this is a practice
9 that we stopped doing now because of this.
10   Q.  How would the employee get the
11 money?  Cash or check?
12   A.  Cash.
13   Q.  Did employees ever sign anything
14 acknowledging the wage advance?
15   A.  They did for the week, yes, they
16 did.  We do not maintain those cash
17 receipts.
18   Q.  So it's your testimony you have no
19 record of the employees signing off on those
20 wage advances or acknowledging that they
21 received the money?
22   A.  Other than their paycheck.
23   Q.  Which at this time you have no
24 records of.  To be clear, if Mr. Morales was
25 to testify he never received the wage

D. D'ONOFRIO

1
2 advance, other than an entry that you
3 entered into the computer, you have no other
4 records of paying the cash or his
5 acknowledging it?
6    A.  I have those time card records
7 with his wage advances, and his statement
8 saying that this is what he got paid a week.
9    Q.  What statement?
10   A.  In the complaint he says he got
11 paid about $400 a week, in 2012 to 2013 he
12 got $450.  That statement in itself
13 correlates the time cards and wage advances.
14   Q.  But there's nothing in the
15 complaint about having received a wage
16 advance.
17   A.  It's his wage throughout the week.
18 It's not an advance.  It's his pay, because
19 he worked one day and he had "X" amount of
20 dollars.  If he had eight hours at minimum
21 wage and he had $56 tallied in his paycheck,
22 he was able to take that $56.
23   Q.  So even though generally employees
24 were paid weekly, they had the option to be
25 paid daily?

D. D'ONOFRIO

1
2    A.  Some people had situations.  If
3 you look at this time card he's over paid --
4        MR. BRESSLER:  Referring to
5 Plaintiff's 2.
6    A.  -- and that would correlate to the
7 beginning of the month.
8    Q.  Are you referring to the one that
9 says 126 on the bottom?
10   A.  Yes, which he was over paid $141.
11   Q.  So to the best of your knowledge,
12 did he repay the $141?
13   A.  Yes.
14   Q.  How?
15   A.  In cash.
16   Q.  He would give you cash?
17   A.  Yes.
18   Q.  So it wasn't withheld from his
19 next check?
20   A.  No.  And that correlated as you
21 can see at the beginning of the month, more
22 than likely the reason why he borrowed extra
23 money was to pay rent.
24   Q.  So to the best of your
25 recollection, was there ever a time that he

19 (Pages 70 - 73)

Page 74

1        D. D'ONOFRIO
2  didn't pay it back and it was withheld from
3  his paycheck.
4     A.  No.
5        MS. REZNICK:  Okay.  Let's take a
6  break.
7        (A short break was taken.)
8        MS. REZNICK:  That's all.
9        (TIME NOTED:  11:50 a.m.)
10
11
12
13  _____
14        DENNIS D'ONOFRIO
15  Subscribed and sworn to before me
16  this _____ day of _____,
17  2015.
18
------------------------
19        NOTARY PUBLIC
20
21
22
23
24
25

Page 76

1
2        C E R T I F I C A T E
3
4        I, ANNMARIE OAKLEY, a Shorthand
5  Reporter and Notary Public within and for
6  the State of New York, do hereby certify:
7        THAT DENNIS D'ONOFRIO, the witness
8  whose deposition is hereinbefore set forth,
9  was duly sworn by me, and that such
10  deposition is a true record of the testimony
11  given by such witness.
12        I further certify that I am not
13  related to any of the parties to this action
14  by blood or by marriage and that I am in no
15  way interested in the outcome of this
16  matter.
17        IN WITNESS THEREOF, I have
18  hereunto set my hand this 21st day of July,
19  2015.
20
21  _____
22  _____
23        ANNMARIE OAKLEY
24
25

Page 75

1
2        I N D E X
3     DIRECT   CROSS   REDIRECT
4  Ms. Reznick      4        69
5  Mr. Bressler         66
6
7        E X H I B I T S
8  EXHIBIT        DESCRIPTION        PAGE
9  Exhibit 1    3 page document       8
10  Exhibit 2    1 page document      40
11  Exhibit 3    4 page document      42
12  Exhibit 4    1 page document      54
13  Exhibit 5    1 page document      57
14  All exhibits retained by Ms. Reznick.
15
16     I N S E R T I O N S
17  DESCRIPTION        PAGE        LINE
18  Name and address of  65         13
      accountant
19
20  Name and address     65       14-16
      of 3 managers
21
22        *      *      *
23
24
25

Page 77

1
2        ERRATA SHEET
3  UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
4  NAME OF CASE:  RAMON MORALES VS. 5 BROTHERS
    RESTAURANT INC., DENNIS D'ONOFRIO, AND OLD
5  TOWN INC.
    DATE OF DEPOSITION: JULY 8, 2015
6  NAME OF DEPONENT:  DENNIS D'ONOFRIO
7
8  PAGE  LINE(S)     CHANGE       REASON
9  ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20
21  _____
       DENNIS D'ONOFRIO
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____,
     2015.
24
    _____
25  NOTARY PUBLIC

| **&** |
| --- |

**&**  2:3,9

| **0** |
| --- |

**000109**  55:4
**000126**  40:13

| **1** |
| --- |

**1**  8:22,25 64:6 75:9
  75:10,12,13
**10**  44:7
**10004**  1:13 2:5
**10:05**  1:15
**11**  30:5 35:11,11
  44:6
**11952**  2:11
**11961**  4:13
**11:50**  74:9
**126**  53:15 73:9
**13**  9:11 10:7 75:18
**13015**  2:10
**14**  1:3 8:13
**14-16**  75:20
**141**  73:10,12
**141.90**  69:17 70:5
**1424**  2:10
**15**  58:6
**17**  43:9
**1st**  61:12 62:19

| **2** |
| --- |

**2**  40:9,12 49:20,21
  52:18,22 53:14 70:5
  73:5 75:10
**2012**  55:20 56:8
  59:20 72:11
**2013**  58:6 59:24
  61:12 72:11
**2014**  21:16 42:6
  43:9 61:20 64:6
**2015**  1:15 74:17
  76:19 77:5,23
**214**  42:18
**21st**  76:18
**225**  23:24

**24**  7:13
**2s**  50:8,9

| **3** |
| --- |

**3**  42:9,13 43:24
  69:22 75:9,11,20
**3/31/2014**  42:19
**32**  1:13 2:4
**37**  58:17,18,21,23
  59:9

| **4** |
| --- |

**4**  4:12,18 35:11
  54:25 55:3 75:4,11
  75:12
**4/6/2014**  42:19
**40**  41:8,13 63:13,14
  63:23 75:10
**400**  66:24 67:9
  69:17,20 72:11
**42**  75:11
**450**  66:24 72:12
**4702**  1:3

| **5** |
| --- |

**5**  1:8 35:11 57:18
  75:13 77:4
**50**  23:15 24:5
**50/50**  14:4,8
**54**  75:12
**56**  72:21,22
**57**  75:13

| **6** |
| --- |

**601**  1:13 2:5
**65**  75:18,20
**66**  75:5
**69**  75:4
**691**  15:14

| **7** |
| --- |

**7.25**  64:4

| **8** |
| --- |

**8**  1:15 64:8 75:9
  77:5
**884**  23:10

**8:30**  35:8
**8th**  51:15

| **9** |
| --- |

**9**  35:8

| **a** |
| --- |

**a.m.**  1:15 74:9
**ability**  6:24
**able**  9:24 54:5 60:25
  72:22
**absolutely**  17:17
  56:16
**accepting**  53:7
**access**  46:3,7,9
**accommodate**  6:18
**account**  69:6
**accountant**  10:19
  64:21,23 65:19
  75:18
**accountant's**  65:4
**accurate**  44:2
**accurately**  39:18,20
  45:2 53:10,12 67:6
**acknowledging**
  71:14,20 72:5
**action**  76:13
**actual**  67:8 70:12
**address**  4:10,17
  15:13 75:18,20
**adjust**  46:12,15
**admitted**  53:7
**advance**  30:11,11,12
  53:17,22 67:24 68:8
  69:17,23 70:23 71:6
  71:14 72:2,16,18
**advanced**  70:19
**advances**  67:20
  68:21 69:5,11,25
  70:8 71:20 72:7,13
**advisement**  16:17
**afternoon**  35:3,4,6
  35:22
**ago**  5:25 8:13 36:18
  40:25 42:25 69:10

**agree**  16:14 45:5
  60:8
**agreed**  3:5,10,14
**alfredo's**  5:2 8:7
  13:10,18,20 23:6
**alter**  47:6,9
**amedeo**  28:13 47:3
**amount**  29:22 41:13
  52:12 53:6,10 54:3
  55:25 67:8,15 68:17
  69:7 72:19
**amounts**  49:24
**annmarie**  1:21 76:4
  76:22
**annual**  10:21 11:6
  11:15
**annually**  62:18
**answer**  5:20 6:10,15
  6:19 9:24 11:20
  15:6 16:19 25:11
  32:7 44:17 48:10
  51:6 54:7 70:4
**answered**  43:4
**anybody**  54:5
**apparently**  11:10
**approve**  21:22
**approximately**
  14:15 15:18 18:15
  36:16
**approximates**  67:14
**april**  55:20
**arl**  1:3
**arrive**  11:11
**arrived**  11:11
**arriving**  31:13
**asked**  6:9 44:13
  56:11,18 57:6 66:21
  67:4,18
**asking**  5:12 6:14,16
  45:3 53:8 64:21
**asks**  38:15
**assume**  6:11 7:20
  16:9 21:12 22:19
  41:18 58:16 66:8

**attempt**  32:21 60:4
**attorney**  11:24
    12:24
**attorneys**  2:4,9
**authority**  17:16,20
    19:24 20:5 46:19
**available**  28:7 60:3
**aware**  10:25 16:11
    16:13 31:23 62:22

**b**

**b**  18:3 75:7
**back**  17:19 39:5,9
    45:24 52:6 55:23
    69:22 74:2
**background**  8:2
**bad**  30:25
**ballpark**  21:11 34:3
    35:24
**based**  10:13 40:4
    50:3 51:18 59:9
    60:20
**basis**  10:3
**bates**  40:13 42:18
    53:15 55:3
**beginning**  34:25
    73:7,21
**behalf**  8:18 9:15,15
    9:21
**believe**  12:15 20:24
    21:13 27:25 43:24
    44:5 49:10 53:9,12
    56:8 58:13 60:12,15
    60:22
**best**  9:14,20 18:14
    22:2 31:16 33:2,17
    34:2 35:18 37:9
    39:11 42:5 43:9,13
    43:20 48:8 49:6
    55:14 57:13 59:9
    60:17 61:5 66:4
    73:11,24
**better**  22:24
**bit**  13:8 25:22

**blood**  76:14
**board**  31:21
**bookkeeping**  17:6
**books**  16:10
**born**  7:16
**borrowed**  73:22
**bottom**  42:18 73:9
**box**  2:10 60:2
**bracket**  41:9
**break**  6:17,20 45:9
    66:19 74:6,7
**breakdowns**  16:8
**bressler**  2:9,12 7:15
    10:5 11:9,18 13:15
    15:22 16:16 24:16
    24:23 25:10 29:5
    32:6,9 36:3 37:15
    44:13,19,23 49:4,8
    50:12,16 51:2,9,23
    60:14 61:9 65:12
    66:20 68:25 73:4
    75:5
**brings**  12:2
**broadway**  1:13 2:4
**brother**  14:7
**brothers**  1:8 14:11
    14:12 77:4
**bulletin**  31:21
**busier**  30:14,17,18
**business**  15:17 30:9
    30:13,25
**businesses**  23:7
**busy**  28:6
**button**  38:15

**c**

**c**  2:2 76:2,2
**calculates**  41:7,9
**call**  29:15
**called**  15:24 30:10
**calls**  51:24
**card**  38:25 41:3,6
    72:6 73:3
**cards**  38:23 72:13

**case**  9:7 27:11 56:2
    77:4
**cash**  48:17,18,19
    49:17,25 50:5 52:17
    55:25 56:4,6 57:2,5
    57:7 71:11,12,16
    72:4 73:15,16
**certain**  30:15,15
**certification**  3:7
**certify**  76:6,12
**change**  58:8 77:8
**changed**  34:4 42:24
    43:15
**characterization**
    45:6
**charge**  22:17
**check**  32:16 48:17
    48:18 49:22,23
    54:18 56:2 60:4,7
    70:2,15 71:11 73:19
**checked**  60:2
**checking**  59:23
**checks**  48:19 49:16
    49:19 50:5,7 54:10
    54:22 56:10
**cheese**  26:7,13
**city**  7:18
**clarify**  8:17 27:19
    31:16 35:20 38:4
    44:19 46:25 62:21
**clarifying**  29:7
**clear**  17:15 52:19
    56:25 69:10 71:24
**client**  44:18 51:5
**client's**  44:17 50:24
**clock**  37:10,13,19
    38:8,14,15,22 39:8
    39:9,24 45:10,19,22
    45:24 46:11,17
    47:20
**clocking**  39:21
**clocks**  38:17
**close**  11:8
**closed**  14:17,19
    35:16 44:11

**code**  38:16,16 45:15
**college**  8:3
**columns**  54:6
**combination**  48:20
    48:21
**come**  30:6 39:4 52:6
    58:20,23 59:6
**coming**  11:22 30:5
    39:20
**communicate**  60:15
**companies**  13:9
**company**  48:14
    54:10
**compensation**  64:11
**complaint**  53:5,10
    66:23 67:13 72:10
    72:15
**complies**  66:3
**complying**  65:22
**computer**  32:23
    36:21,22 37:23 38:4
    40:5 70:10,22,25
    71:2 72:3
**condition**  23:3
**conjunction**  9:7
**consult**  64:14
**contact**  65:9
**contained**  66:23
**contains**  16:8
**contemporaneous**
    70:16
**contradict**  51:21
    52:14
**conversation**  22:4
    33:10,12
**coo**  16:25
**cook**  18:20 27:17,21
    27:22,23 28:2
**copies**  49:18,19
**copy**  11:13 42:11
    57:14
**corporate**  16:10
**corporation**  9:15,16
    14:11,17,19 16:5,18
    17:2

[corporations - employees]                                                                 Page 3

**corporations** 23:8,9 23:22 24:7,11
**correct** 8:19 13:11 17:16 37:3 38:6 40:22 41:16 44:7,11 44:14,22 45:12 47:7 47:9,11 48:2,3 50:6 52:23 54:22 61:17
**correlate** 73:6
**correlated** 69:19 73:20
**correlates** 72:13
**counsel** 3:6 12:13 16:11 44:24 50:17 51:3 67:2
**counsels** 32:14
**counter** 18:21 25:19
**country** 23:10,24
**course** 30:9,13
**court** 1:2 3:18 5:17 5:24 6:3 77:3
**crime** 6:6
**cross** 66:20 69:2 75:3
**currently** 6:23 7:6 18:16
**customer** 26:19 45:19
**customer's** 37:3
**cv** 1:3

**d**

**d** 2:7 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,3 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1

56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:2
**d'onofrio** 1:8,18 4:2 4:9,15 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1,21 14:1 15:1 16:1 17:1 18:1 19:1 20:1,2 21:1 22:1 23:1,21 24:1,4 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1,21 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1,14 76:7 77:4,6,21
**daily** 72:25
**date** 39:3 43:4 77:5
**dated** 56:23
**dates** 14:14,16 42:17
**david** 24:4
**day** 25:4,5 27:7,8 28:19,24 30:2,22 34:22,24 43:10 47:17,20 54:15 58:24,25 59:3 72:19 74:16 76:18 77:23
**days** 19:14 26:21 30:15,15 59:3
**decide** 31:4
**deciding** 28:23
**decision** 21:23 28:18 33:15
**defendants** 1:10,18 2:9 4:2

**deli** 23:12
**dennis** 1:8,18 4:2,9 4:15 74:14 76:7 77:4,6,21
**department** 59:14 59:17
**depend** 25:5
**depends** 25:4
**deponent** 77:6
**deposed** 5:14
**deposit** 39:2
**deposition** 3:8,15 9:12 11:8 12:4 13:2 13:6 32:13 50:25 65:8 76:8,10 77:5
**describe** 12:6 25:22 36:11 38:24 40:2,2
**description** 75:8,17
**detail** 26:5
**determine** 30:8 58:22
**determining** 69:7
**different** 41:20
**direct** 69:9 75:3
**discovery** 10:25 32:14
**discuss** 37:17 57:9
**discussed** 46:21
**dishes** 26:2 34:17
**dishwasher** 18:21 25:18 26:2 27:18 33:19,21 34:13,13 34:21 35:4,13,21
**distributed** 31:20
**district** 1:2,2 77:3,3
**document** 8:21 9:3 16:7 40:8,12,15 42:8,15 54:24 55:2 55:6,11 57:9,17,19 57:25 58:4 75:9,10 75:11,12,13
**documents** 12:3,17 12:20 16:12 65:20 65:21

**doing** 40:3 48:6 71:9
**dollars** 53:6 72:20
**dough** 26:7,13
**drink** 7:12
**drive** 4:12,19
**due** 69:7
**duly** 4:3 76:9
**duties** 17:4 26:9 27:2 33:18 35:13 62:23
**duty** 18:25 19:5 24:21 25:2,9 26:24 27:3,10,16 28:2,19 29:18,22,25 34:16 46:20 60:6

**e**

**e** 2:2,2 13:23 18:3,3 18:4,4 65:5 75:2,7 75:16 76:2,2
**earlier** 30:23 31:2 66:22 67:18
**earned** 67:9,16
**earnings** 52:18
**eastern** 1:2 77:3
**educated** 64:20 65:18
**educational** 7:25
**effect** 3:17
**eight** 18:17 24:14 72:20
**either** 35:12,12 70:15
**ejects** 39:4
**eleven** 19:16
**employed** 18:11,24 19:2 34:8,9,14 42:4
**employee** 5:7 38:12 38:25 45:24,25 46:7 47:19 48:14 62:8,24 71:7,7,10
**employee's** 28:10 30:21 36:20
**employees** 17:13,21 18:15 19:24 23:3

[employees - hours]                                                                   Page 4

24:14,21 29:12,21
30:10 31:20 36:9
37:6,10 39:8,17,19
39:23 40:4 44:10
45:14 46:10 47:6
48:13,16 54:12 55:9
57:5 62:4,17,20
63:18,22 64:19 66:9
71:13,19 72:23
**employment**  20:21
20:23 23:3 43:15
64:2
**ended**  20:21 43:9
**english**  7:20,22,23
59:14 60:10,13,16
60:18,25
**ensure**  64:11 66:2
66:15
**enter**  38:13 70:21
**entered**  70:24 72:3
**entire**  27:7 56:2
**entitled**  67:6
**entity**  14:11
**entry**  67:25 72:2
**eric**  2:12
**errata**  44:22 77:2
**esq**  2:6,12
**estimate**  59:9
**evening**  35:5,6,7
**everybody**  46:5,6
**everyday**  38:5 44:7
**exact**  43:4
**exactly**  10:6 43:3
**examination**  1:17
4:6 66:20 69:2
**examined**  4:5
**example**  30:4
**excellent**  11:22
**exhibit**  8:22,25 40:9
40:12 42:9,13 43:24
53:14 54:25 55:3
57:18 69:22 70:5
75:8,9,10,11,12,13
**exhibits**  68:13 75:14

**exist**  31:24
**existed**  32:17
**existence**  16:5
**experience**  10:13
**explain**  53:17 54:6,8
**explained**  39:23
**external**  38:22
**extra**  59:6 73:22

**f**

**f**  76:2
**fact**  47:15 53:2
60:25
**fair**  15:8 67:12
**familiar**  9:10 10:10
10:12,17 20:11,20
22:13,20 23:2
**far**  11:5
**february**  61:12
62:18
**federal**  64:12 66:3
66:17
**feel**  21:24
**fifty**  24:2
**filed**  10:19
**fill**  55:9
**filled**  58:5 62:13,15
**financial**  17:6
**find**  32:21 49:18
50:4,7
**finish**  6:14
**fire**  17:12,20 20:5
**fired**  22:8
**firm**  5:6
**first**  4:3 41:13 42:17
43:23 69:16,23
**five**  14:11,12,22
15:18 16:3,6 18:19
27:15,19
**flat**  52:12
**floating**  25:16,17
26:22
**flow**  44:16
**fluent**  60:12

**following**  64:17
**follows**  4:5
**force**  3:16
**forget**  45:19
**forgot**  45:22 46:11
47:19
**form**  3:11 7:15 10:6
13:16 15:22 24:24
25:11 37:16 49:5
51:24 55:9 59:24
61:10 68:24 69:4
**format**  48:23
**former**  5:7
**forms**  62:23
**forth**  76:8
**forward**  46:24
**four**  18:7,10 39:12
42:8
**free**  21:24
**friday**  27:12 30:6
**front**  15:2,4 40:11
42:11
**functioning**  39:14
**further**  3:10,14
76:12

**g**

**geasa**  2:9
**general**  45:10
**generally**  29:21,25
30:20 35:4,7,9,21
62:3 72:23
**generated**  45:11
**gestures**  5:23
**give**  5:21 26:5 30:4
34:3 35:24 55:15,21
57:3 59:8 62:3,8
73:16
**given**  10:18 24:22
33:8 44:25 56:21
57:14 58:8,12,14
59:13 61:6,11 66:9
76:11
**gives**  66:11

**giving**  55:11 61:16
61:19
**go**  4:14 5:16 11:19
25:19,20 30:25
38:14 39:9 44:16
45:23 46:17 47:18
55:23 64:15 71:5
**goes**  41:6,8
**going**  18:17 21:21
46:24 50:22 54:7
**gotten**  52:6
**graduate**  8:4
**ground**  5:16
**guess**  36:3 64:20
**guy**  25:18 26:12

**h**

**h**  75:7
**half**  34:22,24 41:14
63:9
**hand**  5:22 76:18
**handing**  8:24
**handwrite**  54:10
**happen**  47:22
**happened**  68:7,15
**head**  10:22 65:7
**held**  1:19
**hereinbefore**  76:8
**hereto**  3:7
**hereunto**  76:18
**hero**  27:24
**heros**  28:4
**hire**  17:12,20 20:5
66:10
**hired**  20:12,14,17
20:18 55:10 62:13
**hiring**  17:7
**hit**  38:15
**home**  31:2,4
**honestly**  15:6 16:19
**hospital**  8:11
**hour**  59:6 64:4,8
**hourly**  41:12 49:13
**hours**  7:13 19:13,15
19:17 29:19,20,22

29:25 30:2,3,21
36:5,9,20 39:18
40:4 41:8,13 44:3
58:17,18,25 59:3
63:13,15,19,23
72:20
**hypothetical**  52:9

## i

**idea**  15:5 54:4
**identification**  8:23
40:10 42:10
**impair**  6:24 7:7
**impaired**  7:10
**implemented**  36:17
**implied**  52:5
**implying**  52:3
**important**  5:21
**incorporated**  15:9
15:20
**index**  1:3
**indicated**  50:8 68:12
**individuals**  65:10
**inform**  37:25 51:3
**information**  38:13
65:9 70:25
**informed**  29:12
**ingredients**  26:15
27:20
**insert**  65:14,15,16
65:17
**instances**  44:25 45:7
**instruct**  17:18 37:18
**instructed**  37:6
**interest**  14:10,14
16:8 23:13,16,23,25
**interested**  76:15
**involved**  28:15
**involvement**  28:22
29:2,10
**ish**  35:8,11
**island**  8:11
**items**  10:8 11:19

## j

**j**  2:12
**january**  64:6
**jefferson**  15:12,14
24:20
**job**  16:21 18:19
33:18 34:10
**jobs**  8:6,9
**jog**  14:24
**jogged**  69:24
**joseph**  2:3 14:7 20:2
23:21 65:5
**joseph's**  20:7
**july**  1:15 21:14,15
42:6 43:9 51:14
76:18 77:5

## k

**keep**  66:14 70:18
**keeping**  41:25 42:21
43:14 66:6
**kinesio**  8:10
**kirschenbaum**  2:3,7
44:15,21 50:14,22
51:5
**kitchen**  27:24
**knew**  30:14,17
**know**  5:6 6:9,16,17
10:22 11:12 16:20
20:18 22:10,12
50:21 51:11 53:24
55:19 56:7 60:6
63:2 65:7 67:24
69:11,18
**knowing**  16:14
**knowledge**  10:4
11:16 18:14 33:6,17
34:2,4 35:19 37:9
39:11 41:21 43:10
44:2 48:8 49:6
60:17,24 63:17
64:24 73:11

## l

**l**  3:3 13:23 18:4,4,4
**labor**  59:14,17
**language**  59:12 61:2
61:3 62:24
**late**  31:7,10,12 35:4
35:6,7,9,22
**latest**  43:7
**laura**  2:6
**law**  64:12 65:23
66:3,17
**laws**  16:18
**lawsuit**  5:8 8:15
**lawyer**  64:14
**ldw**  1:3
**leading**  68:24
**leave**  39:6 65:12
**ledger**  70:16
**left**  5:18
**letter**  33:8
**lie**  60:11
**limit**  47:14
**line**  53:25 75:17
77:8
**listed**  9:11 10:8
**little**  13:8 25:22 26:5
62:16,16
**live**  52:8
**llp**  2:3
**locate**  54:22
**located**  15:11
**location**  16:2
**log**  37:6 38:12 45:15
**long**  8:10 15:16,19
15:20,24 16:4 18:5
33:20 34:5 47:15
**look**  41:19 43:23
58:21 67:23 69:22
73:3
**looked**  9:4,6 43:8
**looking**  69:15
**looks**  40:16 42:16
43:2 58:10

## l

**lose**  45:25
**lot**  11:25

## m

**m**  18:3,4
**ma'am**  33:16 42:14
44:8
**machine**  36:14,19
39:3 40:17 41:4,6
41:16,18,22 42:21
**mailed**  50:18
**maimon**  2:7
**main**  2:10
**maintain**  71:16
**making**  26:14
**man**  18:20 25:15,25
26:8,12 27:17,20
52:5
**management**  17:7,8
24:9
**manager**  17:18 21:6
21:17 22:4 25:15
26:20 27:18 28:5
45:23,23 46:18,20
47:15,18 48:9 71:5
**managers**  17:11,13
17:22,23 18:6,12,18
19:23 20:24 28:11
29:15,16 31:6 38:9
46:3,9,25 65:11
75:20
**manner**  50:20
**march**  58:6
**mario**  18:3 28:12
47:2
**marked**  8:21,25
40:8,12 42:8,12
54:24 55:3 57:17
**marriage**  76:14
**matter**  76:16
**matters**  9:10,22,25
10:4,10,13 11:17
**mattituck**  2:11
**mean**  26:14,22
47:11 54:6 57:23

[mean - payday]                                                                                    Page 6

64:13 68:4 70:14
**meaning** 46:6
**meant** 29:9
**mechanism** 40:2
**medication** 6:24 7:7
**memory** 7:7,10
69:25
**mentioned** 1:20
13:9 27:25
**menu** 28:7
**mid** 35:3
**middle** 23:10,24
**mind** 62:12
**minimum** 63:3,9,18
64:22 72:20
**minutes** 69:10
**miranda** 4:12,19
**misplaced** 61:14
**moments** 5:25
**monday** 19:17 27:11
27:12 28:2,6 30:7
30:18
**mondays** 25:8 27:10
**money** 52:25 68:2
69:25 70:6,19 71:8
71:11,21 73:23
**month** 63:15 73:7
73:21
**morales** 1:4 21:3
22:5,10,14 33:3
34:7 35:20 36:5
37:12,18,25 38:8
41:25 43:11,21 44:3
49:2,7 51:19 55:12
56:3,17 57:6,10,14
58:11 60:9 61:6,11
64:7 71:24 77:4
**morales's** 33:7,18
63:25
**morning** 35:3,15
**mother** 13:21,24
**multiple** 23:18
**multiplied** 41:13

## n

**n** 2:2 3:3 75:2,16,16
**name** 4:7 9:18 13:22
14:12 54:19 65:4
75:18,20 77:4,6
**named** 19:23 65:11
**names** 4:14 18:2
**natural** 44:16
**need** 6:16
**needed** 28:23 30:11
37:25 47:7 48:3,3
**negative** 54:2 69:17
**net** 53:25 69:24
**never** 5:15 44:9
51:20 52:17 71:25
**new** 1:2,13,13,22
2:5,5,11 4:4,12 7:17
7:18 41:3,18,22
42:21,24 76:6 77:3
**night** 22:6
**nods** 5:22
**normal** 68:4
**notary** 1:21 3:16 4:4
74:19 76:5 77:25
**notation** 67:19
**note** 47:24 50:23
69:3 70:15
**noted** 74:9
**notice** 11:23 56:18
57:3,15 58:15 59:13
59:15 60:3,5 61:12
61:16,20 66:7
**notices** 59:17 61:6
66:8
**noting** 70:16
**number** 40:13 42:18
53:15 55:4 58:21
67:13
**numbers** 66:23
69:18

## o

**o** 3:3 18:3,3 75:16
**o'clock** 35:8

**oakley** 1:21 76:4,22
**object** 25:10
**objection** 7:15 10:5
13:15 15:22 24:23
37:15 49:4 51:23
61:9 68:23 69:3
**objections** 3:11
**obligation** 6:2
**observing** 60:21
**occasion** 48:6
**occupation** 4:21
**occurred** 68:11
**offer** 59:15
**okay** 11:14,22 15:8
34:3 74:5
**old** 1:8 5:2,7 8:7,19
9:16,17,19,21 13:10
14:5,6 15:9,14,16
15:20,25 16:4,21
17:4 18:6,15 23:6
24:19 32:15 33:3
34:14 36:8 39:16
41:15 42:20,22
54:18,20 62:2,22
63:2,5,17,21 64:16
65:25 77:4
**once** 19:12 38:13
**one's** 41:23
**ones** 9:4,6 28:15
**open** 19:13 44:6
**opened** 35:15 64:16
**operating** 15:25
**option** 71:6 72:24
**oral** 33:11
**order** 39:21
**ordering** 17:6
**orders** 37:3 45:19
**outcome** 76:15
**output** 41:4,10
**oven** 27:22
**overall** 67:13
**override** 46:18 47:5
47:15,19 48:9
**overtime** 41:8,9,14
63:6,12,22 64:22

**owed** 70:6
**owner** 5:3 13:13,17
16:23 17:3,15 23:8
23:17 24:3
**owners** 13:25 23:18
**ownership** 14:6,10
16:8 23:13,15,23
**owns** 13:20 24:5

## p

**p** 2:2,2 3:3
**package** 50:13,18
**page** 8:21 9:9 40:8
42:8 43:24 54:24
57:17 69:23 75:8,9
75:10,11,12,13,17
77:8
**paid** 22:14 39:21
40:7 48:17,23 49:3
49:7,10,13,16,17,22
49:23,25 51:20 52:6
52:7,11,12,21 53:11
53:13,19,23 56:4,5
57:5,7 63:22 64:3,8
70:3,8 72:8,11,24
72:25 73:3,10
**paper** 15:2,4 32:24
**papers** 10:23,24
11:3,6
**part** 49:22,23 55:25
**particular** 58:15,23
**parties** 3:6 76:13
**party** 8:14
**passed** 22:3
**pay** 48:13,16 55:25
57:22,23 58:9,16
59:15 63:18 72:18
73:23 74:2
**payable** 54:2 69:24
**paycheck** 21:13
69:19 71:22 72:21
74:3
**paychecks** 70:2
**payday** 68:5

| | | | |
|---|---|---|---|
| **paying**  56:10 57:2 64:18 72:4 | **plaintiff's**  8:22,25 32:14 40:9,12 42:9 42:12 43:24 53:14 54:25 55:3 57:18 73:5 | **previously**  42:24 55:24 62:22 | **r** |

**paying**  56:10 57:2
  64:18 72:4
**payment**  70:13
**payments**  49:21
  51:17 52:17
**payout**  69:20
**payroll**  12:11,21
  22:17,20 39:25 40:3
  40:6 41:5,11,22,24
  48:14 54:9 58:21
  70:18
**pc**  2:9
**pending**  6:19 51:6
**penny**  51:20
**people**  18:11 21:2,4
  25:2,8 27:10,14
  28:2 46:21 47:5
  55:25 73:2
**percent**  23:15 24:2,5
**percentage**  48:22,24
**perform**  44:10
**performed**  35:14
**period**  63:14
**permission**  31:8
**person**  9:14,20
  18:21,23,24 19:2,4
  26:3,23 27:3
**personal**  10:13
  11:16 54:19
**personally**  10:17
  37:17,21,24 60:20
**piece**  32:24
**pizza**  9:19,21 15:25
  18:20 25:15,25,25
  26:8,10,11,11,14,18
  27:17,20
**pizzeria**  5:2,8 9:17
  15:10,11,21 17:11
  24:20
**pizzerias**  4:22,25
  13:10
**place**  1:20 39:13
  40:24
**plaintiff**  1:5,19 2:4
  20:12

**plaintiff's**  8:22,25
  32:14 40:9,12 42:9
  42:12 43:24 53:14
  54:25 55:3 57:18
  73:5
**please**  4:8,11 6:9,14
  6:17 12:10 13:22
  65:3,6
**po**  2:10
**point**  36:23,25 66:6
**policy**  31:13
**polite**  45:7
**port**  15:12 24:20
**pos**  36:23 37:5,13
  38:9,14,18 39:7,9
  39:22 40:21 45:12
  45:15 71:4,6
**position**  18:24 19:3
  25:16,17 26:22
  28:21 33:23 34:5,8
  34:9,23 35:12
**positions**  17:9 19:5
  25:20,24 27:16
  28:19,23
**possible**  29:24 56:17
**posted**  31:21,22
**power**  20:4
**practice**  57:3 62:3
  71:8
**practices**  22:20
  64:11
**prep**  18:20 25:18
  26:3,4,6,8,12,23
  27:3 33:25 34:23
  35:3,9,10,13
**preparation**  12:4,22
**prepare**  13:5 70:17
**preparing**  26:10
**present**  20:16 22:7
  38:5
**president**  16:25
  17:2,3
**previous**  47:20
  58:21

**previously**  42:24
  55:24 62:22
**primarily**  37:2
**primary**  59:12 61:2
  61:3
**print**  40:5,18
**printed**  40:17 43:6
**printout**  39:3 41:15
  41:19 43:25
**prior**  8:15 32:13
  36:19 68:4
**probably**  30:6
**process**  40:3
**produce**  11:7 16:15
**produced**  41:21
  43:8 50:9,17
**proficient**  7:22
  60:18
**proficiently**  60:10
**promptly**  11:7
  12:17
**provide**  51:12 62:23
  65:6,9
**provided**  51:4 59:20
  69:16
**provision**  66:7
**public**  1:21 3:16 4:4
  74:19 76:5 77:25
**put**  27:20,22 37:22
  38:3,16 39:5 67:2
**putting**  26:15

**q**

**qualified**  22:24
**queens**  7:19
**question**  3:12 5:22
  6:8,10,15,19,20
  10:6 11:20 12:3
  15:7 24:25 50:16
  51:6 52:9,10 53:15
  58:2 70:4
**questions**  5:12,20
  9:25 64:21 66:22,25
  67:18

**r**  2:2 65:5,5 75:16
  76:2
**rack**  39:5
**raise**  58:12,16
**ramon**  1:4 20:12
  77:4
**rate**  49:13 57:22,23
  58:9
**read**  7:20 11:25 60:9
  60:25 65:20
**reality**  60:4
**realize**  47:19
**realizes**  45:23
**reason**  7:3,9 60:22
  73:22 77:8
**reasonable**  11:12
**recall**  14:16,18,20
  14:23 20:19 21:6,8
  21:9 33:4,5,22 34:6
  43:3 48:5,24 49:2
  50:11 54:15 55:11
  56:9,12,14 57:8
  58:3,11,14 59:23
  61:18,19 62:2 64:2
**receipt**  40:6
**receipts**  71:17
**receive**  50:20 53:2
  62:18
**received**  11:5 12:16
  51:15,16,18 52:17
  52:25 53:5 71:21,25
  72:15
**receiving**  32:14
**recognize**  9:3 40:15
  42:15 55:2,6 57:19
**recollection**  14:25
  22:2 31:17 33:2
  42:6,23 43:14,20
  55:14 57:13 61:5,16
  61:24,25 69:13
  73:25
**record**  4:8,11 11:9
  43:7 44:20 47:6

50:5,23 51:14,21
65:4,13 66:6 70:14
70:16 71:19 76:10
**recording**   39:18
**recordkeeping**
66:14
**records**   12:11,11,21
31:24 32:19 33:7,14
36:4 39:25 41:4,10
41:21,25 42:20
46:10 47:9 48:3,12
49:15,16,24 50:4
51:16 52:10,13,19
52:21 53:9 54:22
58:22 66:16 70:7,11
70:12 71:24 72:4,6
**redirect**   75:3
**referred**   53:21
**referring**   9:17 11:18
24:17,19 73:4,8
**refers**   67:25
**reflect**   45:2 49:19,21
**reflected**   52:18 67:5
68:8
**reflecting**   66:24
**reflection**   44:3
**reflects**   53:10
**refresh**   69:13
**regarding**   9:22 11:6
33:7,15 66:6
**regards**   10:24 64:18
66:13
**related**   76:13
**relates**   67:19
**remember**   8:12
61:21,22 66:25 67:4
**rent**   73:23
**repay**   73:12
**rephrase**   6:10 10:9
25:12
**replace**   21:21
**reporter**   5:17,24
76:5
**representing**   50:19
52:20

**represents**   5:6 53:13
**request**   32:15 41:22
65:8
**requested**   10:25
12:8 16:12 41:23,24
**required**   11:2 63:12
66:16
**reserved**   3:12
**residences**   4:18
**respective**   3:6 26:9
**response**   21:19
56:14
**responses**   5:21
**responsibilities**   17:4
20:8,9 24:10 25:23
**restaurant**   1:8 5:7,9
10:14 15:24 19:8,11
19:13 22:11,15,21
23:4 24:13,17,18
34:21 35:15 38:6
44:6,11 66:2 77:4
**restaurants**   5:4
**retain**   66:16,17
**retained**   32:3,10,12
75:14
**review**   12:3
**reviewed**   11:23 12:7
12:13,22 13:5
**reznick**   2:6 4:6
11:14 29:6 45:5
49:9 51:7,13 68:23
69:3,9 74:5,8 75:4
75:14
**ricardo**   18:4 28:12
47:2
**ridge**   4:12
**right**   9:18 45:16
50:24 51:3 55:21
59:22 68:21
**rise**   44:25
**road**   2:10 15:14
23:10,24
**rodriguez**   18:4
28:12

**roughly**   14:3 58:25
67:13
**rules**   5:17 64:18

s

**s**   2:2 3:3,3 18:3 65:5
75:7,16,16 77:8
**sale**   36:23 37:2
**sales**   10:21 11:6,15
64:25
**sauce**   26:7,12,16
27:5
**save**   32:22 46:24
**saying**   45:8 72:8
**says**   53:16 58:17
59:12 61:2 72:10
73:9
**schedule**   19:7,9
29:13,14,17 31:9
32:21
**scheduled**   36:5 59:3
**schedules**   28:10,16
29:3,10 31:18,23,25
32:17
**sealing**   3:7
**search**   32:19
**see**   53:16 59:23
73:21
**seeing**   55:18 58:3
**seen**   44:24
**select**   71:7
**seminar**   64:15
**send**   11:13 31:4
**sense**   43:19
**sent**   11:10
**series**   66:22
**serra**   65:10
**serve**   28:3
**serves**   26:18
**set**   30:11,12 31:9
76:8,18
**sets**   28:10
**setting**   28:16 29:3
29:10

**seven**   19:14
**shares**   14:3
**sheet**   40:16 42:16
44:22 46:14,16
49:11 69:16 70:20
77:2
**sheets**   68:9,14 69:14
**shift**   24:22 45:16
**short**   45:9 74:7
**shorthand**   76:4
**show**   52:21 65:21
**showed**   31:10,11
69:16
**shown**   68:9,13
**shows**   54:2 69:23
70:17
**sign**   71:13
**signature**   56:24
76:20
**signed**   3:15,17
**signing**   71:19
**similar**   9:4,6
**single**   32:20
**sitting**   5:17
**situations**   73:2
**six**   58:24,25 59:3,3
**slip**   62:12
**slot**   39:2
**slow**   31:5
**slower**   30:15,25
**slows**   30:23
**sole**   5:3 13:13,17
**somebody**   45:22
52:6
**soon**   37:6 56:22
**sorry**   50:14
**space**   65:12
**spanish**   59:13,18,21
59:24 60:3,5 61:2,3
**speak**   9:14,20 37:24
60:9
**speaking**   51:25
65:19
**specific**   12:10 61:15
61:23,25 66:5

| | | | |
|---|---|---|---|
| **speculating** 36:2 | **system** 36:8,11,12 | **theoretically** 50:3 | **title** 16:21,24 |
| 61:22 | 36:13 37:2 38:18,21 | 51:19 | **titles** 18:19 |
| **speculation** 51:24 | 39:13,22 40:21 | **theories** 52:2,4 | **today** 5:12,19 6:6,25 |
| **spell** 13:22 | 41:20 43:14 45:10 | **theory** 52:2 | 7:4,10 8:18 11:23 |
| **split** 14:8 | 45:12 46:4,8 48:12 | **therapist** 8:10 | 12:22 64:2,6 |
| **spoken** 7:23 12:25 | | **thereof** 76:17 | **today's** 9:12 12:4,25 |
| **spreading** 26:16 | **t** | **thing** 39:6 51:15 | 13:5 32:13 |
| **stamped** 40:13 | **t** 3:3,3 75:7,16 76:2 | **things** 10:20 28:3 | **told** 20:24 21:20 |
| 42:18 53:15 55:3 | 76:2 | **think** 6:16 18:13,21 | 22:11 50:17 |
| **start** 34:12 35:22 | **take** 6:20 16:16 | 44:15 | **top** 10:22 39:2 65:7 |
| 39:22 63:25 | 32:16 37:2 38:25 | **third** 9:9 | **total** 24:14 69:7,20 |
| **started** 33:19 37:7 | 39:4,17 41:12 55:22 | **thirteen** 11:19 | 69:21 |
| 45:15 55:15 56:22 | 59:8 64:16 67:23 | **thought** 67:5 | **touched** 35:19 |
| **state** 1:22 4:4,7,10 | 72:22 74:5 | **three** 8:21 17:25 | **town** 1:8 5:2,7 8:7 |
| 64:12 65:3 66:3,17 | **taken** 1:19 45:9 | 18:8,18 19:22 25:13 | 8:19 9:16,17,19,21 |
| 68:10 76:6 | 66:15,19 68:3 69:5 | 25:14 27:10 30:6 | 13:10 14:5,6 15:9 |
| **statement** 44:14 | 70:2 74:7 | 46:9,21,25 47:5 | 15:14,16,20,25 16:4 |
| 51:14 60:8 72:7,9 | **takes** 39:3 | 65:10 | 16:22 17:4 18:6,16 |
| 72:12 | **talk** 10:7 13:8 | **thursday** 27:11,12 | 23:6 24:19 32:15 |
| **states** 1:2 57:23 | **talked** 55:23 | 28:3 30:19 | 33:4 34:14 36:8 |
| 59:19 77:3 | **talking** 17:9 47:2 | **time** 1:20 3:12 6:17 | 39:16 54:18,20 |
| **station** 15:12,15 | 52:4 | 11:12 22:3 25:3 | 62:22 63:2,5,21 |
| **status** 51:10 | **tallied** 72:21 | 28:8,9 30:2 31:14 | 64:16 66:2 77:5 |
| **steps** 32:16 39:16 | **tasks** 44:9 | 34:7 35:25 38:14,15 | **town's** 62:2 |
| 64:15 65:21 66:5,15 | **taxes** 54:2 69:24 | 38:22 39:4,12 40:16 | **track** 70:18 |
| **stipulated** 3:5,10,14 | **tell** 6:2,6 15:9 21:24 | 41:3,6,7,14,24,25 | **tracked** 36:20 |
| **stopped** 71:9 | 29:16 67:23 | 42:16,21 43:14 | **tracking** 36:9 |
| **store** 70:6 | **telling** 51:9 | 44:24 45:10,25 | **transcribing** 5:19 |
| **stored** 70:25 71:3 | **ten** 19:16 69:10 | 46:14,15,24 47:6,12 | **trial** 1:17 3:13 |
| **subjects** 9:11 | **terminated** 22:5 | 47:14 48:3 49:11 | **true** 76:10 |
| **submitted** 12:5,7 | **terminating** 33:11 | 55:21 56:2,4,5,7 | **truth** 6:2,6 |
| **subscribed** 74:15 | **termination** 33:7,8 | 57:6 58:12,15 59:16 | **truthfully** 6:25 7:4 |
| 77:22 | **terms** 23:3 | 61:17 63:14,17 64:3 | **try** 6:18 66:4,18 |
| **suite** 1:13 2:5 | **testified** 4:5 | 64:7,16 66:9 67:14 | **trying** 49:18 |
| **sunday** 19:18 | **testify** 6:25 7:4 | 68:9,13 69:12 70:23 | **turn** 9:9 11:2 12:17 |
| **sundays** 54:17 | 50:24 51:20 52:12 | 71:23 72:6,13 73:3 | 53:14,25 |
| **supposed** 37:13,19 | 52:16 71:25 | 73:25 74:9 | **turned** 12:14 |
| **sure** 32:20 39:17,19 | **testifying** 6:3 8:18 | **timecard** 12:11,21 | **two** 4:24,25 13:10 |
| 45:4,5 47:12 50:7 | 44:17,18 50:15 | 36:12,13,19 38:20 | 13:25 36:18 40:25 |
| 55:19 56:21 57:10 | **testimony** 12:12 | 43:21 46:12,13 | 42:25 55:22 61:17 |
| 64:17 65:22 | 44:22 49:12 50:4 | **timecards** 48:2 | **types** 17:9 |
| **switched** 56:9,19 | 52:20,24 53:22 | **timely** 50:20 | **u** |
| **swore** 5:24 | 63:21 71:18 76:10 | **times** 20:10 62:9,12 | **u** 3:3 18:3 |
| **sworn** 3:17 4:3 51:8 | **thank** 29:6 | 63:9 | |
| 74:15 76:9 77:22 | | | |

**unable**  54:21
**understand**  5:9,11
  5:25 6:5,8,12,21
  7:23 8:17 10:11
  24:25 32:18 37:12
  45:8 53:8 58:2 63:5
**understanding**  29:8
  36:25 53:4 59:2,16
  62:14 63:8,11
**understood**  6:11
  57:10 62:24
**uniform**  67:9
**united**  1:2 77:3
**upper**  17:7,8
**use**  37:5 39:23,24
  43:21 45:14 48:9,13
  54:9 69:14
**usually**  19:10 24:15
  24:15 27:9

**v**

**v**  13:23
**variation**  29:24 30:3
**varied**  67:11
**vary**  29:18,20 30:16
  30:22 67:10 68:17
**varying**  67:15
**verbal**  5:21
**verify**  52:11
**volume**  10:21 11:6
  11:16 64:25
**vs**  77:4

**w**

**w**  49:20,21 50:8,9
  52:18,22
**wage**  41:12 53:17,21
  56:18 57:3 61:16
  63:3,10,18 64:22
  67:19,24 68:21 69:5
  69:11,16,23 70:8,23
  71:5,14,20,25 72:7
  72:13,15,17,21
**wait**  34:18
**waived**  3:9

**want**  35:20 44:19
  45:3 46:24
**washed**  34:17
**washes**  26:2
**waste**  44:23
**way**  31:9 43:5 50:13
  58:10 76:15
**weather**  30:24
**week**  19:12,14 21:13
  25:6 29:13,18 30:16
  30:16,17,18,22,22
  32:4,4,10,10 36:6
  44:4 49:8,9 52:13
  52:25 53:6,20 54:13
  54:16 55:22 58:18
  58:24 59:4 63:15,16
  63:23 66:24,25 67:9
  67:15,15 68:3,17,18
  69:6,21 70:9 71:15
  72:8,11,17
**weekly**  58:17 72:24
**weeks**  48:19,20 68:8
  68:12,14,20
**went**  8:3 33:25
  70:17
**wickham**  2:9
**withheld**  73:18 74:2
**witness**  32:8,11
  51:25 76:7,11,17
**work**  33:20 36:9
  47:16 52:7 58:18
**worked**  22:14 34:5
  35:20 40:4 43:11
  44:4 47:13 53:13,23
  56:3 63:19,22 72:19
**working**  8:7 20:25
  21:3,18 33:3 37:7
  45:16 55:16
**works**  38:24
**write**  47:23,24
**written**  16:7 29:14
  31:17 32:24 33:8
  60:18 65:24
**wrong**  43:3

**x**

**x**  1:3,11 53:5 72:19
  75:2,7

**y**

**yeah**  25:7 43:2
  47:25 62:25
**year**  14:21 21:15
  43:18 62:6,16
**yearly**  62:15
**years**  8:13 14:22
  15:18 16:3,6 18:7
  18:10 36:18 39:12
  40:25 42:25
**york**  1:2,13,13,22
  2:5,5,11 4:4,12 7:17
  7:18 76:6 77:3

**z**

**z**  18:3,3
**zero**  20:9

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.